2005 WY 83

**Kevin Francis O'BOYLE, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 04–125.

Supreme Court of Wyoming.

July 28, 2005.

Representing Appellant: Terry W. Mackey of Moriarity, Gooch, Badaruddin & Booke, LLC, Cheyenne, Wyoming; Scott A. Homar of Hickey & Evans, LLP, Cheyenne, Wyoming; and Shawna M. Geiger of Shawna Mackey Geiger, P.C., Greenwood Village, Colorado. Argument by Mr. Mackey.

Representing Appellee: Patrick J. Crank, Attorney General; Paul Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Georgia L. Tibbetts, Senior Assistant Attorney General. Argument by Ms. Tibbetts.

Before HILL, C.J., and GOLDEN, KITE, and VOIGT, JJ., and STEBNER, D.J., RET.

KITE, Justice.

[¶ 1] Kevin O'Boyle was stopped for speeding by the highway patrol on Interstate 80 near Cheyenne. After extensively questioning him in the patrol car, the trooper indicated Mr. O'Boyle was free to leave. As Mr. O'Boyle was returning to his vehicle, however, the trooper spoke to Mr. O'Boyle and obtained his agreement to further questioning and, ultimately, to a search of his vehicle. The trooper found approximately five pounds of marijuana in the vehicle.

[¶ 2] Prior to trial, Mr. O'Boyle filed a motion to suppress the evidence seized in the search, claiming that his rights were violated under article 1, § 4 of the Wyoming Constitution and the Fourth Amendment to the United States Constitution. The district court initially granted the motion and then upon reconsideration denied it on the basis of federal law. Mr. O'Boyle then pleaded guilty to one count of possession of a controlled substance in violation of Wyo. Stat. Ann. § 35–7–1031(a)(ii) (LexisNexis 2003), conditioned on his right to appeal the denial of his suppression motion.

[¶ 3] We hold that under all of the circumstances the questioning inside the patrol car was unreasonable and unconstitutional under article 1, § 4, of the Wyoming Constitution. We further hold that Mr. O'Boyle's consent to additional questioning outside the patrol car and his consent to the search were not voluntary under article 1, § 4. Analyzing the stop under the Fourth Amendment, we adhere to the rule established in *Terry v. Ohio*, 392 U.S. 1, 19–20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889, 903–904 (1968) that questioning during a traffic stop must be limited to the purpose of the stop, including a reasonable inquiry about travel plans, and may not be extended unreasonably beyond the scope of the initial stop absent valid consent, a reasonable suspicion of other illegal activity, or officer safety concerns. Applying this rule, we hold the detention and search were unconstitutional under the Fourth Amendment.

[¶ 4] Reversed.

## ISSUES

[¶ 5] Mr. O'Boyle presents the following issue:

Did the Trial Court err in determining that the recent cases interpreting the federal constitution required him to reverse his Order Granting Motion to Suppress rather than following the Wyoming Constitution and the case law in support thereof?

The State re-phrases the issue as follows:

Did the district court err in denying Appellant's motion to suppress the marijuana evidence discovered during a search of his vehicle?

## FACTS

[¶ 6] On February 1, 2003, Wyoming Highway Patrol Trooper Ben Peech stopped the rental car driven by Mr. O'Boyle for traveling 79 miles per hour in a 75 mile per hour zone. Trooper Peech, armed and in uniform, approached Mr. O'Boyle's vehicle and asked to see his driver's license and the rental car agreement. The trooper then asked Mr. O'Boyle to accompany him to his patrol car while he issued a warning for speeding.

[¶ 7] In the patrol car, Trooper Peech requested Mr. O'Boyle's criminal history from dispatch. While waiting for the history, he questioned Mr. O'Boyle extensively, asking him where he was headed, how long he planned to stay, where he was coming from, what he did for a living, how long he had been doing it, who was filling in for him while he was gone, how long his son had been in Boston, what college his son attended, what courses his son was taking, whether his son lived on campus, where he would stay while visiting his son, why he was driving rather than flying, why the rental car was in his daughter's name, where his daughter was at the time, how many daughters he had, and the price of airfare from San Francisco to Boston. During this phase of the questioning, Trooper Peech asked Mr. O'Boyle over thirty questions, most of which had nothing to do with the speeding violation and many of which did not relate to his travel plans.

[¶ 8] Also during this phase of the questioning, Trooper Peech called for back-up

assistance, specifically requesting a canine unit. The unit arrived within two minutes of the call and parked behind and to the right of Trooper Peech's patrol car.[1] Trooper Peech continued to question Mr. O'Boyle until dispatch advised that Mr. O'Boyle had a criminal history and later advised that his history was negative for violent or drug-related offenses.[2] At that point, seven minutes into the traffic stop, Trooper Peech handed Mr. O'Boyle his documentation and the warning and told him to "have a safe trip."

[¶ 9] Mr. O'Boyle got out of the patrol car and was passing in front of it, heading toward the rental car, when Trooper Peech also got out and inquired whether he could ask Mr. O'Boyle a few more questions. Mr. O'Boyle responded, "Sure, go ahead" and Trooper Peech questioned him for another five minutes, repeating many of the same questions Mr. O'Boyle had already answered.

[¶ 10] During this part of the questioning, the trooper and Mr. O'Boyle were standing on the edge of the interstate a few feet apart in front of the patrol car. The canine unit was still parked behind and to the right of Trooper Peech's patrol car.[3] Trooper Peech held a clipboard on which he appeared to be writing down Mr. O'Boyle's answers. He asked Mr. O'Boyle an additional thirty questions during this phase of the stop, including his son's name, date of birth, address and phone number, what courses his son was taking at Northeastern University, his daughter's name and phone number, why she rented the car, whether his son had a job, and the name of Northeastern University's mascot.

[¶ 11] Trooper Peech then asked Mr. O'Boyle whether he had anything in his vehicle that he should know about—guns, bombs, dead people, body parts, large amounts of cash, drugs, methamphetamines, heroine, cocaine or marijuana. Mr. O'Boyle denied having any of those items. Trooper Peech asked Mr. O'Boyle why he was so nervous, repeated his question about guns, bombs and body parts and asked if he could search the vehicle. Mr. O'Boyle responded, "Sure, go ahead." Trooper Peech opened the back hatch of the rental car, unzipped a bag located inside and discovered a vacuum-sealed bag containing a substance resembling marijuana underneath some clothing. At that point, the dog was released to "sniff" the vehicle. He alerted to the back of the vehicle. Ultimately, the troopers recovered five such bags totaling approximately five pounds of marijuana.

[¶ 12] Mr. O'Boyle was charged with one count of possession of a schedule I nonnarcotic controlled substance, marijuana, with intent to deliver in violation of § 35–7–1031(a)(ii). Prior to trial, he filed a motion to suppress the evidence seized from his vehicle, asserting that "the illegal contact, detention, interrogation and search" violated both the state and federal constitutions and citing Wyoming and federal law in support of his claim. The State filed a responsive brief in which it argued the initial traffic stop was legal, whether the stop was pre-textual was irrelevant, the detention inside the patrol car was reasonable, and the encounter and search that followed were consensual.

[¶ 13] The district court conducted a hearing on the motion to suppress. Trooper Peech was the only witness and he testified for several hours. During the hearing, the

---

1. Trooper Peech testified initially that the canine unit arrived "sometime during the time I asked for the criminal history and the criminal history returned...." Then he testified that he called for the canine unit after dispatch advised him of Mr. O'Boyle's criminal history. On cross-examination by defense counsel, however, with the aid of his written report, Trooper Peech clarified that he called for the canine unit four minutes after he made the traffic stop. Thus, it is clear that Trooper Peech called for the canine unit before he knew about Mr. O'Boyle's criminal history.

2. From the video tape recording, it is clear only that Mr. O'Boyle had a criminal history. It is not clear what that history involved. However, Trooper Peech testified that Mr. O'Boyle had a prior non-violent, non-drug-related felony conviction.

3. On cross-examination, defense counsel asked Trooper Peech whether, while he was questioning Mr. O'Boyle in the patrol car, the second trooper got out of his car and played catch with the dog. Trooper Peech responded, "I don't think so" and then, "I don't know." Thus, it is unclear where the second trooper and the dog were while Mr. O'Boyle was being questioned.

district court asked counsel about a recent Wyoming Supreme Court opinion in which this Court declined to address a state constitutional claim on the ground that it was not adequately presented. Defense counsel was not familiar with the case and offered to file a supplemental brief addressing the case.

[¶ 14] A couple of weeks later, Mr. O'Boyle filed a supplemental brief in which he discussed *Fender v. State*, 2003 WY 96, 74 P.3d 1220 (Wyo.2003), the recent opinion issued by this Court, and re-argued and expanded upon his contention that the stop violated article 1, § 4 of the Wyoming Constitution. The same day, the State also filed a supplemental memorandum. It did not address the state constitutional claim but, citing federal cases, focused instead on the argument that the Fourth Amendment was not implicated because the encounter was consensual. Two weeks later, and before the State responded to Mr. O'Boyle's supplemental brief, the district court entered an order granting the motion to suppress. In the order, the district court stated:

> Despite the fact that O'Boyle received his paperwork back from Trooper Peech, the totality of the circumstances suggests that the investigative stop never ended, but continued after O'Boyle left the patrol car.

> \* \* \*

> The burden lies with the State to dispel the suggestion that the investigative stop continued even after O'Boyle exited the patrol car. I am not persuaded that the State has carried this burden.

[¶ 15] The following day, the State filed a supplemental brief on the state constitutional claim in which it argued that Wyoming generally has followed federal search and seizure law and the Wyoming case cited by Mr. O'Boyle, *Tobin v. State*, 36 Wyo. 368, 255 P. 788 (Wyo.1927), in which this Court arguably applied a different standard under the Wyoming Constitution, did not change the fact that evidence seized after a detainee voluntarily consented to further questioning or a search is admissible. Because the evidence showed Mr. O'Boyle voluntarily consented to further questioning and the search, the State

argued, *Tobin* did not support granting the suppression motion.

[¶ 16] One week later, the State also filed a motion for reconsideration in which it: 1) asserted the district court erred in ruling on the motion before the State filed its response to Mr. O'Boyle's supplemental brief; 2) reiterated its argument that Mr. O'Boyle voluntary consented; and 3) cited two recent decisions from the Tenth Circuit Court of Appeals as additional authority. Mr. O'Boyle filed a response addressing specifically the issues raised by the State in its motion for reconsideration. The district court then entered a second order, this time denying the motion to suppress. In this order, the district court stated:

> After the date of entry of the ORDER GRANTING MOTION TO SUPPRESS, the State petitioned this Court for reconsideration citing newly released decisions by the United States Court of Appeals for the Tenth Circuit. *United State v. Taverna*, 2003 U.S.App. LEXIS 22475 (10th Cir. 2003); *United States v. Manjarrez*, 2003 U.S.App. LEXIS 22679 (10th Cir.2003).

> These decisions compel me to reconsider the prior ORDER GRANTING MOTION TO SUPPRESS. I continue to believe that an ordinary reasonable person would not feel free to terminate the encounter and drive off without responding to the continued interrogation initiated by Trooper Peech, but I must temper my belief and allow it to be informed by the recent rulings cited above.

> Accordingly, the MOTION TO SUPPRESS will be denied because the facts of *United States v. Taverna*, are essentially identical to the facts in this case.

[¶ 17] Mr. O'Boyle entered a plea of guilty to the charge while reserving his right to appeal the denial of his suppression motion. The district court accepted his plea and, after a hearing, sentenced Mr. O'Boyle to a term of three to five years in the Wyoming State Penitentiary, which sentence the district court suspended, placing Mr. O'Boyle on three years supervised probation.

## STANDARD OF REVIEW

[¶ 18] Rulings on the admissibility of evidence are within the sound discretion of the trial court. *Urbigkit v. State,* 2003 WY 57, ¶ 39, 67 P.3d 1207, ¶ 39 (Wyo.2003). We will not disturb such rulings absent a clear abuse of discretion. *Id.* An abuse of discretion occurs when it is shown the trial court reasonably could not have concluded as it did. *Hannon v. State,* 2004 WY 8, ¶ 13, 84 P.3d 320, ¶ 13 (Wyo.2004). Factual findings made by a trial court considering a motion to suppress will not be disturbed unless the findings are clearly erroneous. *Meek v. State,* 2002 WY 1, ¶ 8, 37 P.3d 1279, ¶ 8 (Wyo.2002). Because the trial court has the opportunity to hear the evidence, assess witness credibility, and draw the necessary inferences, deductions, and conclusions, we view the evidence in the light most favorable to the trial court's determination. *Id.* Whether an unreasonable search or seizure occurred in violation of constitutional rights presents a question of law and is reviewed *de novo. Vasquez v. State,* 990 P.2d 476, 480 (Wyo.1999).

## DISCUSSION

[¶ 19] Mr. O'Boyle contends the district court erred in relying solely on federal constitutional analysis and not analyzing the constitutionality of the search under the Wyoming Constitution, which he asserts provides greater protection against searches than federal law. He further contends proper analysis under either the state or federal constitutions supported his motion to suppress. Lastly, Mr. O'Boyle contends the district court's finding "that an ordinary reasonable person would not feel free to terminate the encounter and drive off without responding to the continued interrogation" was a factual finding which this Court can reverse only if we conclude it was clearly erroneous. Giving the district court the deference it is due, he asserts, the finding was not clearly erroneous and the district court properly granted his suppression motion initially and erred in denying it upon reconsideration.

[¶ 20] Responding to Mr. O'Boyle's first argument, the State contends this Court's approach has long been to read the Wyoming Constitution as consistent with the federal constitution. The State asserts this Court, like the federal courts, has applied the totality of the circumstances test when evaluating whether consent was voluntary, focusing on whether the consent was the product of duress or coercion and taking into account subtly coercive police questioning and the subjective state of mind of the person giving consent. Under either state or federal analysis, the State asserts, the district court properly denied the suppression motion because the evidence clearly showed Mr. O'Boyle voluntarily consented to the search. Responding to Mr. O'Boyle's final argument concerning the district court's finding that no reasonable person would have felt free to leave, the State asserts Mr. O'Boyle's argument is premised upon a selective interpretation of the district court's order. The State argues the statement Mr. O'Boyle refers to, when read in context, clearly reflects the district court's recognition that denial of the suppression motion was in accordance with the law.

[¶ 21] The district court's order on reconsideration is central to the issue before us. As reflected above, after initially granting the motion to suppress and then reviewing the State's supplemental authority, the district court concluded it was compelled to reconsider its ruling. Upon reconsideration, the district court reiterated its belief that a reasonable person would not have felt free to terminate the encounter and leave without answering further questions, but concluded based solely upon the State's supplemental Tenth Circuit authority that it had to deny the suppression motion. It is not apparent from the record why the district court did not address Mr. O'Boyle's state constitutional claim after Mr. O'Boyle presented it first in his initial motion and then again in his supplemental brief. What is clear is that the district court relied exclusively on federal law in reaching its decision. The district court's analysis is not controlling of our de novo review, a standard requiring this Court to consider the claim anew as if it had not been heard before, and, pursuant to *Vasquez,* we are required to reconsider it.

[¶ 22] In *Vasquez*, 990 P.2d at 485, we made clear that analysis under the state constitution is required whenever a party has raised a state constitutional claim and provided proper argument and briefing using a precise and analytically sound approach. Where a party has met these criteria in presenting a state constitutional claim, as Mr. O'Boyle has done, state constitutional analysis takes primacy—that is, the claim is analyzed first under our state constitution. *Id.*, fn. 4. In the present case, after requesting the parties to brief the state constitutional claim, the district court cited exclusively federal law in reversing its earlier order and denying the suppression motion. No analysis of the state constitution and its guarantees appears in the order. Because Mr. O'Boyle properly raised the issue, such an analysis is required. Our review is de novo, there are no factual disputes and we have a complete record before us, including the transcript of the suppression hearing and the video tape recording of the traffic stop. Therefore, we proceed with the analysis.

### State Constitutional Analysis

#### 1. General Overview

[¶ 23] Our state constitution provides protection of individual rights separate and independent from the protection afforded by the U.S. Constitution. The U.S. Supreme Court has made it clear in that states at a minimum must comply with its interpretations of the federal constitution. *Mapp v. Ohio*, 367 U.S. 643, 654–55, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081 (1961). However, it also has made clear that states may separately interpret and apply their own constitutions. *Id.* In interpreting their own constitutions, states generally have focused upon whether their particular state constitution provides *greater* protection than the federal constitution. *Mogard v. City of Laramie*, 2001 WY 88, ¶ 5, 32 P.3d 313, ¶ 5 (Wyo.2001). However, using federal law as a guide, states may also conclude that the scope of the protection provided by their constitution is the same as and parallel to that provided by the federal constitution. In the context of the facts of this case, the result we reach is the same under article 1, § 4 of the Wyoming Constitution and the Fourth Amendment of the U.S. Constitution. We do not consider whether our state constitution provides more protection than the federal constitution but conclude only that article 1, § 4 constitutes a separate and independent source of protection of the rights of Wyoming citizens.

[¶ 24] In *Saldana v. State*, 846 P.2d 604, 622 (Wyo.1993), we identified six *"non-exclusive neutral criteria"* [4] for consideration in analyzing a claim under our state constitution: 1) the textual language of the provisions; 2) differences in the texts; 3) constitutional history; 4) preexisting state law; 5) structural differences; and 6) matters of particular state or local concern. Based upon the first of these, we concluded long ago that article 1, § 4 is stronger than its federal counterpart in that it requires search warrants to be supported by an affidavit.[5] *State v. Peterson*, 27 Wyo. 185, 194 P. 342, (1920). *See also Hall v. State*, 911 P.2d 1364 (Wyo.

---

**4.** We emphasize that these are "non-exclusive" criteria. The identification of these factors does not mean they are the *only* criteria for analyzing a state constitutional claim or that they *all* must be addressed in every case. As stated in *State v. Gunwall*, 106 Wash.2d 54, 720 P.2d 808 (1986), the case from which they were derived, these criteria are *relevant* to determining whether, in a given situation, a state constitution should be considered as extending broader rights to its citizens than does the United States Constitution. The criteria are aimed at suggesting where counsel might focus his or her argument in cases urging independent state constitutional grounds and helping to insure that when a court relies upon independent state constitutional grounds, the result is based upon well founded legal reasons and not merely the substitution of the particular court's notion of justice for that of duly elected legislative bodies or the United States Supreme Court. *Gunwall*, at 813. While state constitutional claims need to be thoroughly briefed and discussed and the *Gunwall* criteria provide an appropriate framework, those criteria are neither compulsory nor exclusive.

**5.** Article 1, § 4 of the Wyoming Constitution provides:

> **§ 4. Security against search and seizure.** The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated, and no warrant shall issue but upon probable cause, supported by affidavit, particularly describing the place to be searched or the person or thing to be seized.

1996). With this exception, however, we have found the first three *Saldana* criteria to be of little assistance in analyzing claims brought specifically under our search and seizure provision. *Vasquez*, 990 P.2d at 484. Except for the affidavit requirement for search warrants, the text of Wyoming's search and seizure provision is substantially the same as the Fourth Amendment, and there is little in the way of Wyoming constitutional history to guide our analysis.

[¶ 25] Looking at the fourth *Saldana* factor, preexisting state law, this Court historically has interpreted Wyoming's search and seizure provision as forbidding unreasonable searches and seizures and has said the question of whether a search or seizure was reasonable was one of law to be decided from all the circumstances. *Vasquez*, 990 P.2d at 484, citing *State v. George*, 32 Wyo. 223, 239, 231 P. 683, 688 (1924); *State v. Crump*, 35 Wyo. 41, 51, 246 P. 241, 244 (1926). Beyond this general reasonableness standard, and the warrant requirement specifically mentioned in the text of article 1, § 4, this Court has not extensively considered the scope of Wyoming's provision independent of the protection guaranteed by the Fourth Amendment. Rather, this Court, like the majority of other state courts, generally has decided search and seizure cases on the basis of federal Fourth Amendment law. Many of our past decisions have not specified whether they also applied to the state provision, while others have construed the state and federal constitutions together, treating the former as having the same scope as the latter. *Gronski v. State*, 910 P.2d 561, 565–66 (Wyo.1996); *Parkhurst v. State*, 628 P.2d 1369, 1374 (Wyo.1981); *Callaway v. State*, 954 P.2d 1365, 1371 (Wyo.1998).

[¶ 26] In *Vasquez*, however, we performed a separate state constitutional analysis and concluded that article 1, § 4 provided greater protection than the Fourth Amendment under the particular facts presented. Specifically, we held the vehicle search at issue was permissible: 1) under the Fourth Amendment because it was incident to a lawful arrest; and 2) under article 1, § 4 because it was incident to a lawful arrest *and was reasonable under all the circumstances*

in that law enforcement had a reasonable suspicion that one of the occupants was armed. It was this requirement that the search be reasonable under all the circumstances as we said in *Vasquez* that distinguished Wyoming constitutional law from Fourth Amendment law.

[¶ 27] Since *Vasquez*, we have not had the opportunity to consider a search and seizure claim brought specifically under article 1, § 4. In the cases in which this Court might have performed such an analysis, the issue either was not raised at all, or the party raising the issue failed to provide cogent argument or properly present the question in the trial court, or we simply declined to address the state constitutional claim and decided the case on other grounds. *Doles v. State*, 994 P.2d 315, 320 (Wyo.1999); *Putnam v. State*, 995 P.2d 632, 640 (Wyo.2000); *Bailey v. State*, 12 P.3d 173, 177 (Wyo.2000); *Meadows v. State*, 2003 WY 37, ¶ 21, 65 P.3d 33, ¶ 21 (Wyo.2003). As in most of the cases before *Vasquez*, therefore, our analysis since *Vasquez* has focused on the Fourth Amendment. Because these post-*Vasquez* cases contain no separate, independent state constitutional analysis, they are not controlling of our resolution of Mr. O'Boyle's claim. These cases are, however, instructive and relevant to our analysis.

[¶ 28] With this general overview in mind, we turn to consideration of the specific question before us: whether a traffic stop involving extensive questioning, followed by the defendant's consent to a second detention and more questioning, and culminating in the defendant's consent to a vehicle search was reasonable under all the circumstances. We consider each stage of the traffic stop separately, beginning with the traffic stop and initial detention, moving next to the second detention and further questioning and concluding with Mr. O'Boyle's consent to search. Our analysis of the last two stages focuses on whether Mr. O'Boyle voluntarily consented.

### 2. *The Traffic Stop Detention*

[¶ 29] As stated in the general overview above, we concluded in *Vasquez*, 990 P.2d at 488, that article 1, § 4 requires all searches and seizures to be reasonable under

all of the circumstances. We said, "only unreasonable searches are forbidden, and whether or not a search is reasonable is a question of law to be decided from all the circumstances of a case." *Id.*, at 487. Looking at our early decisions in cases where the State asserted a search without a warrant was proper merely because the citizen did not resist, we concluded in *Vasquez* that this Court historically considered such contentions as a threat to our constitutional safeguards and "firmly disposed of the idea that a citizen's peaceful submission to a search amounted to a consent." *Id.* In reviewing past decisions, however, we found that a search of an automobile without a warrant was reasonable under some circumstances. We concluded that warrantless automobile searches are proper under article 1, § 4, when incident to lawful arrest and when there is probable cause for believing that a vehicle is carrying contraband or illegal goods.

[¶ 30] In reaching this result in *Vasquez*, we rejected the bright line rule established in *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981) that arrest justifies the search of a passenger compartment, including any open or closed container in it, without consideration of the privacy interest involved. We concluded the rationale for the *Belton* rule, i.e. the need for a bright line rule to effectively apply to the vast, national citizenry with which the U.S. Supreme Court must concern itself, did not apply in Wyoming. We found a narrower standard, one maintaining the requirement that a search be reasonable under all of the circumstances, more consistent with the historical intent of our search and seizure provision. *Vasquez*, 990 P.2d at 489. In the specific context presented in *Vasquez*, i.e. a vehicle search incident to an arrest, we said Wyoming's search and seizure provision provided greater protection than the federal provision.

[¶ 31] In the broader context of searches and seizures in general and for purposes of considering Mr. O'Boyle's claim, which did not arise out of a search incident to arrest, what is important about *Vasquez* is our holding that article 1, § 4 requires that searches and seizures be reasonable under all the circumstances. It is this standard of reasonableness that governs our analysis under the Wyoming constitution. Thus, the determinative question in Mr. O'Boyle's case is the reasonableness of the detention under all the circumstances.

[¶ 32] Having considered all of the circumstances, we conclude the detention inside the patrol car was unreasonable. Trooper Peech's extensive questioning of Mr. O'Boyle while waiting for dispatch, including questions about what he did for a living, how long he had been doing it, who was filling in for him while he was gone, how long his son had been in Boston, what college his son attended, what courses his son was taking, whether his son lived on campus, where he would stay while visiting his son, why he was driving rather than flying, where his daughter was, how many daughters he had, and the price of airfare from San Francisco to Boston, was not reasonable given all of the circumstances. Mr. O'Boyle was not under arrest and the State conceded Trooper Peech did not have a reasonable suspicion of other criminal activity.[6] Yet, four minutes into the stop, and before he was aware of Mr. O'Boyle's criminal history, Trooper Peech called for back-up assistance, specifically a canine unit. The unit arrived just two minutes later and parked directly behind the patrol car. By the time Trooper Peech returned Mr. O'Boyle's license and paperwork, issued the warning and told him to "have a safe trip," Mr. O'Boyle had been detained and subjected to persistent and sustained questioning that unreasonably expanded the scope of the stop far beyond the speeding offense into a full-blown drug investigation. At no time during this phase of the detention did Trooper

**6.** In its brief in opposition to the suppression motion, the State conceded: "While Trooper Peech was suspicious of Defendant, his suspicions did not rise to the level that would justify continued investigative detention, a fact which he made explicit by returning Defendant's license and paperwork, releasing him, and informing him that he was free to go." Likewise, at the suppression hearing, the State informed the district court it was not contending there was reasonable suspicion of other illegal activity. Consistent with the State's representations, Trooper Peech testified he did not have a suspicion sufficient to warrant further detention or a search.

Peech ask Mr. O'Boyle for his consent to this type of questioning or detention. Under all of the circumstances, the detention inside the patrol car was unreasonable and violated article 1, § 4 of the Wyoming Constitution.

[¶ 33] In reaching this result, we consider not only *Vasquez* and the older Wyoming cases analyzing our search and seizure provision *(George,* 231 P. at 688; *Crump,* 246 P. at 244), we also consider matters of local and state concern. *Saldana,* 846 P.2d at 622. The State of Wyoming is bisected north and south and east and west by two major interstate highways. Interstate 80 provides drug traffickers with easy west to east access across the United States and is a well-known route for transporting drugs. DEA Microgram Bulletin, Vol. XXXVII, No. 9, September 2004; NDIC Narcotics Digest Weekly 2004; 3(35):3. The annual average daily traffic on I–80 near Cheyenne, where Mr. O'Boyle was stopped, is over 20,000 vehicles. 2002 Wyoming Vehicle Mile Book (WYDOT). Wyoming citizens operate a significant number of these vehicles. Traffic stops along I–80 are a routine part of the national drug interdiction program. "Although precise figures detailing the number of searches conducted pursuant to consent are not—and probably can never be—available, there is no dispute that these type of searches affect tens of thousands, if not hundreds of thousands, of people every year." Marcy Strauss, *Reconstructing Consent,* 92 Journal of Criminal Law and Criminology 211, 214 (2001–2002).[7]

[¶ 34] We previously have expressed disapproval of the use of traffic violations as a pretext to conduct narcotics investigations. *Damato v. State,* 2003 WY 13, ¶ 13, 64 P.3d 700, ¶ 13 (Wyo.2003). In *Damato,* we joined in another state court's expression of concern about sanctioning conduct "where a police officer can trail a targeted vehicle with a driver merely suspected of criminal activity, wait for the driver to exceed the speed limit by one mile per hour, arrest the driver for speeding, and conduct a full-blown inventory search of the vehicle with impunity."[8] *Id.,* citing *Arkansas v. Sullivan,* 532 U.S. 769, 771–772, 121 S.Ct. 1876, 1878, 149 L.Ed.2d 994 (2001). Our location along a nationally recognized drug trafficking corridor likely results in a disproportionately large percentage of Wyoming's comparatively small population being subjected to what have become routine requests to relinquish their privacy rights by detention, invasive questioning and searches—all without reasonable suspicion of criminal activity other than the offense giving rise to the stop. While we acknowledge the importance of drug interdiction, we are deeply concerned by the resulting intrusion upon the privacy rights of Wyoming citizens. This concern, considered together with Wyoming's traditional interpretation of article 1, § 4 as requiring reasonableness under all the cir-

7. See also:

> *Harris v. State,* 994 S.W.2d 927, 932, n. 1 (Tex.Crim.App.1999) (police officer testified that he asked for consent to search every car he stopped, regardless of suspicion). Another police officer testified that he routinely requested permission to search any car he stopped for a traffic violation; in one year he requested consent to search 786 times. *Ohio v. Robinette,* 519 U.S. 33, 40, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (Ginsberg, J., concurring). Another officer stated that, personally, he had searched in excess of 3,000 bags in nine months. *Florida v. Kerwick,* 512 So.2d 347, 349 (Fla.Dist.Ct.App.1987). In one city, it was estimated that ninety-eight percent of the searches were by consent. Paul Sutton, *The Fourth Amendment in Action: An Empirical View of the Search Warrant Process,* 22 Crim. L. Bull. 405, 415 (1986); Joshua Dressler, Understanding Criminal Procedure § 17.01, at 241 (2d ed.1997) (discussing estimates that ninety-eight percent of warrantless searches are con-

> ducted via consent). As Professor Dressler wrote, "Put simply, there are few areas of Fourth Amendment jurisprudence of greater practical significance than consent searches." *Id.* at 214, n. 8.

8. See also *State v. Retherford,* 93 Ohio App.3d 586, 639 N.E.2d 498, 503–04 (1994), where the court said:

> What is obviously troubling about these cases is that hundreds, and perhaps thousands of Ohio citizens are being routinely delayed in their travels and asked to relinquish to uniformed police officers their right to privacy in their automobiles and luggage, sometimes for no better reason than to provide an officer the opportunity to "practice" his drug interdiction technique.

> While we recognize the importance of drug interdiction, we are shocked by what we believe to be an unjustified and egregious intrusion upon the privacy rights of the citizens of Ohio.

cumstances, provides further support for our conclusion that the detention in this case violated the Wyoming Constitution.

### 3. Consent to Further Detention

[¶ 35] Our conclusion that the detention unreasonably exceeded the permissible scope of the stop does not end the inquiry. After questioning Mr. O'Boyle inside the patrol car, Trooper Peech concluded the initial detention by returning his driver's license and rental papers, handing him the warning and telling him to "have a safe trip." Mr. O'Boyle got out of the patrol car and was heading back toward his vehicle when Trooper Peech inquired whether he could ask him a few more questions. Mr. O'Boyle responded, "sure." We must determine whether Mr. O'Boyle voluntarily consented to further questioning such that his continued detention was proper under article 1, § 4.

[¶ 36] As with our analysis of the constitutionality of the traffic stop, there is little in the text of article 1, § 4 or our constitutional history to assist us in determining whether Mr. O'Boyle's consent was sufficiently voluntary to validate his continued detention. Therefore, we look to prior Wyoming cases for the standards governing our analysis.

[¶ 37] Most of the early cases considering article 1, § 4 involved premises searches rather than vehicle searches like the one to which Mr. O'Boyle was subjected. See, for example, *Tobin*, 36 Wyo. 368, 255 P. 788. We conclude, however, that the standards invoked in those cases are no less applicable in the context of vehicle searches. In fact, we find the standards this Court has applied in premises searches—where the individual is on his or her own premises and likely feels freer to turn law enforcement away—even more applicable in the context of roadside vehicle searches—where the traveler has been stopped for a traffic offense and is not free to leave.

[¶ 38] Thus, this Court's early interpretation of Wyoming's search and seizure provision as forbidding unreasonable searches and seizures applies also in the context of expanded detentions following a traffic stop and the question of whether such a detention was reasonable is one of law to be decided from all the circumstances. *Vasquez*, 990 P.2d at 487, citing *State v. George*, 32 Wyo. 223, 239, 231 P. 683, 688 (1924); *State v. Crump*, 35 Wyo. 41, 51, 246 P. 241, 244 (1926). This Court long ago rejected the assertions under article 1, § 4 that peaceful submission constituted consent to search and seizure and that reasonableness could be demonstrated merely by a citizen's failure to resist. *Tobin*, 36 Wyo. 368, 255 P. 788. We said that a waiver of constitutional rights under our constitution must appear by clear and positive testimony, and, if a search or seizure is based upon the proposition that consent was given, there should be no question from the evidence that consent was "really voluntary and with a desire to invite search [or seizure], and not done merely to avoid resistance." *Id.* at 789. Acquiescence and nonresistance have not been deemed sufficient under Wyoming law to establish consent. *State v. Bonolo*, 39 Wyo. 299, 270 P. 1065 (1928).

[¶ 39] Pursuant to these early cases, the standards relevant generally to determining whether a search or seizure was constitutional under article 1, § 4 are:

1. unreasonable searches and seizures are prohibited;

2. the question of whether a search or seizure was reasonable is one of law to be decided from all the circumstances;

3. the reasonableness of a search or seizure cannot be shown by mere failure to resist, and peaceful submission, acquiescence and/or non-resistance do not constitute consent. There should be no question that consent was really voluntary, given with a desire to invite search and not merely to avoid resistance.

4. the reasonableness of a search or seizure must be shown by clear and positive testimony.

*Tobin*, 255 P. at 789; *Bonolo*, 270 P. at 1067. This Court reaffirmed these standards in *Vasquez*, 990 P.2d at 483; thus, they are the

standards that apply in our article 1, § 4 analysis.[9]

[¶ 40] As Mr. O'Boyle got out of the patrol car after seven minutes of questioning concerning a variety of topics relating to his trip, his family and himself, Trooper Peech asked if he would mind answering a few more questions. Mr. O'Boyle responded, "Sure, go ahead." The videotape of this exchange reflects that there were no threats or use of force or overt coercion or intimidation. Trooper Peech asked the question calmly and politely and not in an antagonistic or demanding way.

[¶ 41] However, by the time Trooper Peech asked Mr. O'Boyle if he could ask him a few more questions, he had already questioned Mr. O'Boyle for seven minutes about his trip, his activities leading up to the trip, his son and daughter, his occupation and other tangential topics. He also had called for a canine unit, which arrived during the initial questioning and parked behind Trooper Peech's patrol car. Despite these circumstances, and his later admission that he did not have reasonable suspicion to detain Mr. O'Boyle further, Trooper Peech detained Mr. O'Boyle on the edge of the interstate highway for another five minutes, asking him numerous questions, some of which he had already asked, and writing down the answers on a clipboard as though he were performing an official investigation. Although Trooper Peech's questioning was not hostile or threatening, there is no question from the videotape that it was steady and sustained and did not pertain to the speeding offense. Trooper Peech was dressed in uniform and armed and another trooper was at the scene with a drug dog. Mr. O'Boyle was not informed that he did not have to answer any more questions or had the right to leave. The district court found that no reasonable person under these circumstances would have felt free to go.

[¶ 42] At the end of this inquiry, Trooper Peech asked Mr. O'Boyle whether he had anything in his vehicle that Trooper Peech should know about—guns, bombs, dead people, body parts, large amounts of cash, drugs, methamphetamines, heroine, cocaine or marijuana. Mr. O'Boyle denied having any of those items and Trooper Peech asked why he was so nervous. Mr. O'Boyle responded that he was nervous because he had been stopped. Trooper Peech then inquired again whether Mr. O'Boyle had guns, bombs, or body parts and asked if could search the vehicle. By this time, Mr. O'Boyle had been detained on the side of an interstate highway and had been subjected to twelve minutes of multiple, repetitive and intrusive questioning with two troopers and a drug dog on the scene. He responded, "Sure, go ahead."

[¶ 43] Considering all of the circumstances, we are unable to conclude the State met its burden of proving Mr. O'Boyle's consent to further questioning was really voluntary, given with a desire to invite further detention and not merely to avoid resistance. Under article 1, § 4, Mr. O'Boyle's acquiescence to further questioning did not constitute consent and was not sufficient to demonstrate the reasonableness of the search and seizure. We agree with the district court's finding that no reasonable person under those circumstances would feel free to go. We believe the vast majority of citizens facing similar circumstances would simply submit to the officer's requests believing they had no other option.

### 4. *Consent to Search*

[¶ 44] We adhere to the standards for determining whether consent is voluntary discussed in the preceding section and hold that Mr. O'Boyle's acquiescence to the vehicle search did not constitute consent and was not sufficient to demonstrate the reasonableness of the search and seizure. Under article 1, § 4 of the Wyoming Constitution, we hold that the district court correctly granted the suppression motion in its initial ruling

---

9. In our Fourth Amendment cases, we generally have applied the preponderance of the evidence in determining whether consent was voluntary. *Parkhurst,* 628 P.2d at 1378, citing *Fitzgerald v. State,* 601 P.2d 1015 (Wyo.1979); *Stamper v. State,* 662 P.2d 82, 86–87 (Wyo.1983). However, in *Stanton v. State,* 692 P.2d 947, 951 (Wyo.

1984), we cited *Tobin* for the rule that under Wyoming law the waiver of a constitutional right must appear by "clear and positive testimony." Thus, the standard for purposes of article 1, § 4 analysis is the clear and positive testimony standard established in *Tobin* and reaffirmed in *Vasquez.*

and erred in denying the motion upon reconsideration.

### The Fourth Amendment

[¶ 45] In the circumstances of this case, we do not perceive any difference between the independent protection provided to Mr. O'Boyle under the Wyoming Constitution and that provided by the Fourth Amendment. However, because Mr. O'Boyle relied on the Fourth Amendment as well as article 1, § 4, we proceed with Fourth Amendment analysis.

### 1. The Traffic Stop

[¶ 46] In determining whether a traffic stop detention was reasonable under the Fourth Amendment, we apply the two-part inquiry established in *Terry v. Ohio*, 392 U.S. at 19–20, 88 S.Ct. 1868, that is: 1) was the initial stop justified, and 2) were the officer's actions during the detention "reasonably related in scope to the circumstances that justified the interference in the first instance[?]" *Campbell v. State*, 2004 WY 106, ¶ 11, 97 P.3d 781, ¶ 11 (Wyo. 2004). In making this inquiry, the U.S. Supreme Court has rejected bright-line rules and focused instead on a fact-specific reasonableness inquiry. *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 421, 136 L.Ed.2d 347 (1996); *Barch v. State*, 2004 WY 79, ¶ 8, 92 P.3d 828, ¶ 8 (Wyo.2004). Under the Fourth Amendment, the government has the burden of demonstrating that a seizure was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure. *Id.*

[¶ 47] In many of our traffic stop cases (as in Mr. O'Boyle's case) the reasonableness of the initial stop was not challenged, and our focus was on the second prong of the *Terry* inquiry: whether the officer's actions during the detention were reasonably related in scope to the circumstances justifying the interference in the first place. It is clearly established under the second part of *Terry* that an investigative detention must be temporary, lasting no longer than necessary to effectuate the purpose of the stop, *and the scope of the detention must be carefully tailored to its underlying justification. Campbell*, ¶ 12, citing

*Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325–26, 75 L.Ed.2d 229 (1983). Moreover,

> During a routine traffic stop, a law enforcement officer may request the driver's proof of insurance, operating license, and vehicle registration, run a computer check, and issue a citation or warning. The officer may detain the driver and his vehicle only for the period of time reasonably necessary to complete these routine matters. Once the driver has produced a valid driver's license and proof that he is entitled to operate the vehicle, he must be allowed to proceed without further delay. *During the stop, an officer generally may not ask the detained motorist questions unrelated to the purpose of the stop,* including questions about controlled substances, *unless the officer has reasonable suspicion of other illegal activity.*

*Campbell*, ¶ 12 (citations omitted, emphasis added).

[¶ 48] In the absence of the particular individual's valid consent, an officer may expand an investigative detention only where there exists an objectively reasonable suspicion that criminal activity has occurred or is occurring, *Damato v. State*, 2003 WY 13, ¶ 13, 64 P.3d 700, ¶ 13 (Wyo.2003), or there exists an objectively reasonable suspicion that a vehicle occupant is armed, *Brown v. State*, 944 P.2d 1168, 1172 (Wyo.1997). A number of courts also allow inquiry into travel plans during a traffic stop at least to the extent reasonably necessary to put the traffic violation in context. *See* Wayne R. LaFave, 4 *Search and Seizure* § 9.3(d), 392–395, (4th ed.2004) and cases cited therein. Although this Court has not separately considered the precise question of whether travel plan inquiries are permissible under the Fourth Amendment, we have mentioned such inquiries in the course of addressing other search and seizure issues and have treated them as an acceptable area of inquiry during a traffic stop. *Barch*, ¶ 11; *Meadows*, ¶ 21. However, purposeful probing by law enforcement, amounting to a fishing expedition in the hope that something might turn up, is not permitted. *Campbell*, ¶ 21.

[¶ 49] To summarize, the standards applicable in considering the constitutionality of traffic stops under the Fourth Amendment are as follows: An officer's actions during a traffic stop must be reasonably related to the purpose of the stop. *Campbell,* ¶ 11, citing *Terry.* Absent valid consent, a reasonable suspicion of other unlawful activity or reasonable suspicion that a detainee is armed, an officer may not expand an investigative detention beyond the scope of the stop, ask questions unrelated to the stop or "embark on a fishing expedition in the hope that something will turn up." *Id.* The relevant question is whether the scope of the stop was reasonable under the totality of the circumstances, and the burden of proving reasonableness lies with the government.

[¶ 50] These are the fundamental principles this Court has adhered to in the past in determining whether a traffic stop was constitutional under the Fourth Amendment and they are not significantly different than those applicable separately under article 1, § 4 of the Wyoming Constitution. We see no reason to depart from these standards today. In our view, continued application of these standards is consistent with the essential policy of balancing the individual right to privacy and the government's legitimate interests. *Damato,* ¶ 8; *Barch,* 92 P.3d at 831.

[¶ 51] In reaffirming these standards, we are cognizant that some courts appear to have retreated from the Fourth Amendment reasonableness standard established in *Terry.* To quote one recognized legal authority on the subject:

> [W]hen it comes to traffic stops, ... the *Terry* limitations are honored more often in the breach than in the observance. For one thing, the temporal limits are loosely observed, and courts even go so far as to state that such limits may be extended somewhat in the interest of permitting procedures only relevant to drug law enforcement. For another, the intensity limitation is treated as if it did not exist at all, so that nonsearch investigative procedures undertaken to uncover drugs are deemed permissible so long as they actually or approximately occurred within whatever temporal limits are being observed.

LaFave, *supra,* 368. Thus, in *United States v. Malouff,* 114 Fed.Appx. 975, 2004 WL 2581075 (10th Cir.2004), the court concluded: "an officer may question a traffic-stop detainee **on any topic** without reasonable and articulable suspicion so long as the questioning does not prolong the stop." (emphasis added). According to the court, "a less-confined reasonableness standard is appropriate in this context." *Id.*

[¶ 52] As *Malouff* illustrates and LaFave points out, *Terry* has been whittled away to the point that in some jurisdictions "routine" traffic stops are commonly turned into drug investigations through a variety of techniques, including "questioning about drugs, grilling about the minute details of travel plans, seeking consent for a full roadside exploration of the motorist's car, or parading a drug dog around the vehicle." LaFave, *supra,* 370. The result, "is a far cry from a straightforward and unadorned traffic stop" and, in the context of a nonconsensual police-citizen encounter, "can be so intrusive as to affect the Fourth Amendment legality of the traffic stop." *Id.* Moreover, as the Illinois Supreme Court has stated, "[a]llowing police to pose any question to the occupants of a stopped vehicle, even if such question is totally divorced from the purpose of the stop, effectively does away with any balancing of the competing interests involved." *People v. Gonzalez,* 204 Ill.2d 220, 273 Ill.Dec. 360, 789 N.E.2d 260, 269 (2003).

[¶ 53] In the context specifically of cases allowing extensive inquiry into travel plans during a *Terry* stop, we agree with LaFave's characterization of such questioning as an "interrogation" consisting not of "social one-liners like 'hey, where you headed?'" but of "multi-question extended inquiries of vehicle occupants into the most minute details regarding the parts of the journey completed and lying ahead." LaFave, *supra,* 393–394.

> The objective is not to gain some insight into the traffic infraction providing the legal basis for the stop, but to uncover inconsistent, evasive or false assertions that can contribute to reasonable suspicion or probable cause regarding drugs. Thus, "not only are questions about travel plans investigatory rather than merely conversational,

the ordinary traveler cannot reasonably be expected to decline to answer such questions, particularly if they are posed while an officer is holding the driver's license and other essential documents."

*Id.* at 395.

[¶ 54] These results are not consistent with the approach we have taken traditionally in analyzing the constitutionality of a traffic stop by balancing the interests of our citizens and the government's legitimate interests and strictly applying the *Terry* limits on what constitutes a *reasonable* detention during a traffic stop. To conclude that an officer may question a detainee on any topic without reasonable suspicion so long as the questioning does not prolong the stop and that a less confined reasonableness standard is appropriate in the context of a routine traffic stop is in our view an unwarranted and a radical departure from *Terry*. It is a departure we are not willing to make, given our traditional approach to the question of what constitutes a reasonable detention. Thus, we adhere strictly to *Terry* and will continue to resolve these cases when the federal constitution is at issue by asking whether the scope of the stop was reasonably related to its purpose, or was supported by a reasonable suspicion of other unlawful activity or valid consent.[10] LaFave, *supra,* 392–395. Thus, under the Fourth Amendment, the State must prove the scope of the stop was reasonable under the totality of the circumstances, that is, that the scope of the stop was reasonably related to its purpose or was supported by valid consent, reasonable suspicion of other unlawful activity or legitimate safety concerns

[¶ 55] Upon being stopped by Trooper Peech for speeding, Mr. O'Boyle was seized within the meaning of the Fourth Amendment. *Campbell,* ¶ 3. We must decide under the totality of the circumstances whether Trooper Peech's actions during the detention were reasonably related in scope to the speeding stop. In making this determination, we are guided by the following principles: 1) a detention must be carefully tailored to the reason for the stop; 2) an officer may request the detainee's driver's license, proof of insurance, and vehicle registration or rental papers, run a computer check and issue a citation or warning; 3) an officer may make reasonable inquiry into travel plans to the extent necessary to put the traffic violation in context; 4) absent reasonable suspicion of other illegal activity or that a detainee is armed, the officer may not ask questions unrelated to the stop; and 5) an officer may expand the scope of the detention only with valid consent or a reasonable suspicion of other illegal activity or that the detainee is armed. *Campbell,* ¶ 12; *Damato,* ¶ 13.

[¶ 56] Applying these standards to the facts presented by Mr. O'Boyle, we conclude the detention inside the patrol car went beyond the scope of the speeding violation giving rise to the stop. Trooper Peech's extensive questioning inside the patrol car while waiting for dispatch involved not only legitimate questions about Mr. O'Boyle's travel plans and the rental car, but questions far removed from either his travel plans or the speeding violation. Under the totality of the particular facts presented, these questions constituted a multi-question investigatory interrogation into minute details concerning private aspects of Mr. O'Boyle's life.

[¶ 57] Additionally, considering the totality of the circumstances, neither the questioning nor the detention in general was carefully tailored to the speeding violation. Four minutes into the stop, and before he was aware of Mr. O'Boyle's criminal history, Trooper Peech called for back-up assistance, specifically a canine unit. The unit arrived just two minutes later and parked directly behind the patrol car. By the time Trooper Peech returned Mr. O'Boyle's license and paperwork, issued the warning and told him "to have a safe trip," Mr. O'Boyle had been subjected to sustained and persistent questioning about matters having no relationship to his travel plans or the speeding offense and the scope of the detention had expanded far beyond the

---

10.   We are not alone in strictly adhering to *Terry*. See *State v. Gutierrez,* 137 Idaho 647, 51 P.3d 461 (2002); *People v. Cox,* 202 Ill.2d 462, 270 Ill.Dec. 81, 782 N.E.2d 275 (2002); *United States v. Holt,* 264 F.3d 1215 (10th Cir.2001); *People v. Gonzalez,* 204 Ill.2d 220, 273 Ill.Dec. 360, 789 N.E.2d 260 (2003); *State v. Fort,* 660 N.W.2d 415 (Minn. 2003).

speeding offense into a full-blown drug investigation—all without Mr. O'Boyle's consent or, as Trooper Peech conceded in his testimony and the State has conceded throughout these proceedings, a reasonable suspicion of other criminal activity.

[¶ 58] The fact that some of Trooper Peech's questions were permissible under the Fourth Amendment as inquiry about travel plans does not change this result. As was stated in *United States v. Holt*, 264 F.3d 1215, 1220 (10th Cir.2001):

> When stopped for a traffic violation, a motorist expects "to spend a short period of time answering questions and waiting while the officer checks his license and registration." At the same time, the government has a strong interest in ensuring that motorists comply with traffic laws. Thus, it is beyond dispute that an officer may ask questions relating to the reason for the stop. Ordinarily, this also includes questions relating to the motorist's travel plans. Travel plans typically are related to the purpose of a traffic stop because the motorist is traveling at the time of the stop. For example, a motorist's travel history and travel plans may help explain, or put into context, why the motorist was weaving (if tired) or speeding (if there was an urgency to the travel).

The question, however, is one of reasonableness under the totality of the circumstances. Viewed in this light, the intrusive questioning Trooper Peech engaged in constituted unconstitutional, purposeful probing more akin to a fishing expedition than to a permissible expansion of an investigative stop supported by reasonable suspicion. *Campbell*, ¶¶ 11–12.

[¶ 59] Moreover, we have reviewed the Fourth Amendment travel plan cases and found none involving facts quite like those presented here. For example, the questions were not motivated by safety concerns as occurred in *Holt*, 264 F.3d at 1215, and were much more extensive and far reaching than the questions asked in *United States v. Williams*, 271 F.3d 1262 (10th Cir.2001). The questions were not prompted by or directly related to objectively suspicious circumstances as they were in *United States v. Zabalza*, 346 F.3d 1255 (10th Cir.2003)

(where upon first talking to the defendant, the officer detected the odor of marijuana coming from the vehicle); *United States v. Oliver*, 363 F.3d 1061, 1067 (10th Cir.2004) (where upon being asked to present the vehicle rental agreement, the defendant opened the glove box, revealing a cylindrical package wrapped in brown paper which he tried to push back out of sight when he saw that the officer noticed it); *United States v. Soto*, 988 F.2d 1548 (10th Cir.1993) (where the defendant was unable to provide even a general address for the uncle from whom he said he borrowed the vehicle he was driving); and *United States v. Pena*, 920 F.2d 1509 (10th Cir.1990) (where the vehicle had California plates and a punched out trunk lock and was being driven by an Illinois licensed driver who could not provide the registration). Few of the questions asked had anything to do with the fact that Mr. O'Boyle was traveling 79 miles per hour in a 75 mile per hour zone and his answers neither helped explain nor put into context why he was speeding. Based upon the totality of the circumstances, we hold the questioning was unreasonable and was unconstitutional under the Fourth Amendment.

### 2. *Consent to Further Detention*

[¶ 60] Interpreting the Fourth Amendment in the context of deciding whether an officer had valid consent for expanding the scope of a traffic stop, we have said:

> "Subject to certain exceptions, warrantless searches and seizures are per se unreasonable under both the Fourth Amendment to the United States Constitution and Article 1, Section 4 of the Wyoming Constitution. Among the recognized exceptions are searches and/or seizures conducted pursuant to a valid consent. 'Whether an exception exists in a particular case is a question of fact that may be properly resolved by a preponderance of the evidence standard in the light of all attendant circumstances.' When this Court reviews questions of fact, we view the evidence in the light most favorable to the prevailing party. The burden of proving that the circumstances of a particular case fit within an exception is with the State."

*Meadows,* ¶ 23 (citations omitted). Addressing specifically the issue of whether consent was voluntary under the Fourth Amendment, we have said:

"In determining whether a warrantless search was justified by a valid consent, we inquire 'into the voluntariness of the consent in light of the totality of the circumstances' of the particular case. Some of the factors that a court may consider in determining whether the consent was voluntary include: the way the law enforcement officer phrased the request for permission to search; whether the officer told the individual that he could refuse the request; and the presence of other coercive factors. We must consider all the circumstances surrounding the encounter to determine whether a reasonable person would have felt 'free to decline the officers' requests or otherwise terminate the encounter.' No single factor is determinative when we are ascertaining whether a seizure occurred."

"The question of whether consent to search was voluntary is one of fact to be determined in light of all the circumstances."

*Grant v. State,* 2004 WY 45, ¶ 22, 88 P.3d 1016, ¶ 22 (Wyo.2004) (citations omitted). We applied these principles in *Grant* to uphold the district court's finding that consent was voluntary based upon evidence that the defendant was never threatened in any way, essentially volunteered consent, was not handcuffed or otherwise restrained when he gave consent, was wearing a winter jacket while detained outside in the cold, and was cooperative. *Id.*[11]

[¶ 61]   In the context of consent given after an unconstitutional detention, as we have in Mr. O'Boyle's case, we have said:

The government bears the burden of proving the voluntariness of consent, and that burden is heavier when consent is given after an illegal stop. In determining whether a detained motorist freely and voluntarily consented to a further detention or search after an illegal detention, we must consider the totality of the circumstances surrounding the consent, with a focus upon three factors . . .: "the temporal proximity of the illegal detention and the consent, any intervening circumstances, and, particularly, the purpose and flagrancy of the officer's unlawful conduct." In other words, the State had the burden of establishing that Campbell's consent was "sufficiently an act of free will to purge the primary taint of the illegal detention, or it must be suppressed as fruit of the poisonous tree."

*Campbell,* ¶ 14 (citations omitted). Applying these factors, we held in *Campbell* that the consent was not sufficient to remove the taint of the prior unconstitutional detention.

[¶ 62]   In summary, the question whether consent to further detention was voluntary under the Fourth Amendment is determined from the totality of the circumstances, focusing on whether a reasonable person would have felt free to decline the officer's requests or otherwise terminate the encounter. *Grant,* ¶¶ 22–23. We also consider the time between the unconstitutional detention and consent, any intervening factors and the purpose and flagrancy of the officer's actions. *Campbell,* ¶ 14. These are the standards we traditionally have applied and will continue to apply under the Fourth

---

11.  *Meadows,* although distinguishable, is also worth mentioning. In *Meadows,* ¶ 24, we upheld a district court ruling that the State satisfied its burden of proving consent was voluntary. In *Meadows,* the defendant driver initially denied permission to search but then agreed to the search after the officer told him he could not leave until a canine unit was brought to the scene. *Meadows,* however, is of limited significance to Mr. O'Boyle's claim because the claim that consent was involuntary was based in large part on the contention that the detention was illegal. We found the detention was legal and, as noted in the opinion, that finding rendered the consent issue moot. *Id.,* ¶ 22, fn. 5. *Meadows* is also factually distinguishable in that the officer had reasonable suspicions justifying continued detention of the defendants after issuing citations for the offense giving rise to the stop because the passenger provided false identification and the driver could not produce a driver's license or proof of insurance, gave conflicting stories about why he did not have his driver's license, and gave a different address than the address located by dispatch. *Id.,* ¶ 4.

Amendment in determining whether consent was voluntarily given.

[¶ 63] When Trooper Peech asked Mr. O'Boyle if he could ask him a few more questions, Mr. O'Boyle had already been subjected to repetitive and intrusive questioning unrelated to the speeding violation or his travel plans with two troopers and a drug dog on the scene. Only a matter of seconds had expired since the unconstitutional detention inside the patrol car, no intervening circumstances had occurred and Trooper Peech was clearly fishing for evidence of some other illegal activity. Mr. O'Boyle was not informed he did not have to answer any more questions or had the right to leave. Although not a controlling factor, the fact that a detained motorist is not informed that he is free to leave or refuse consent is a factor to be considered in determining whether consent was voluntary. *Campbell*, ¶ 16; *Grant*, ¶ 22.[12] Considering the totality of the circumstances, we agree with the district court that a reasonable person would not have felt free to refuse to answer further questions. Under these circumstances, Mr. O'Boyle's consent was not sufficiently voluntary to remove the taint of the prior unconstitutional detention.

### 3. Consent to Search

[¶ 64] In the context of roadside consensual vehicle searches arising out of traffic stops:

> Requesting consent has apparently become yet another part of the "routine" of "routine traffic stops," and it is thus not surprising that the cases contain acknowledgements by police about the frequency of this tactic. These requests result in affirmative responses in the overwhelming majority of cases; guilty or innocent, "most motorists stopped and asked by police for consent to search their vehicles will expressly give permission to search their vehicles", resulting in "thousands upon thousands of motor vehicle searches of innocent travelers each year."
>
> * * *
>
> Here again, the failure of most courts, when dealing with traffic stop consent searches, to adhere to the *Terry* limits on what constitutes a reasonable temporary detention has produced very distressful results. Consent searches ... are now a wholesale activity accompanying a great many traffic stops, submitted to by most drivers, guilty or innocent, and resulting in continued interruption of their travels for a substantial period of time while they wait by the roadside as their vehicles are ransacked, a process which beyond question "is highly invasive of the dignitary interests of individuals."

LaFave, *supra*, 395–397. This outcome is not consistent with the Fourth Amendment. We adhere to the standards for determining whether consent is voluntary discussed in the preceding section and hold that Mr. O'Boyle's consent to the vehicle search was not sufficiently voluntary to purge the taint of the first unconstitutional detention. Evidence obtained as a result of the search was fruit of the poisonous tree. The district court correctly granted the suppression motion in its initial ruling and erred in denying the motion upon reconsideration.

### CONCLUSION

[¶ 65] We reaffirm that the Wyoming Constitution requires that searches and sei-

---

12. In *Ingersoll v. State*, 2004 WY 102, ¶ 22, 96 P.3d 1046, ¶ 22 (Wyo.2004), we noted in dicta that "Ingersoll gave consent to [the officer] to search the vehicle." The validity of Ingersoll's consent was not the issue before us. Rather, Ingersoll claimed that defense counsel was ineffective in failing to file a second suppression motion, after the first one was denied, attacking the validity of his consent. In addressing the ineffectiveness issue, we suggested the consent was voluntary, cited in dicta a Wyoming case for the proposition that an officer is not required to inform a driver during a traffic stop that he is free to leave and cited in dicta a Maryland case for the proposition that "even when a police officer has no basis for suspecting criminal activity beyond that which prompted a traffic stop, the police officer may generally ask questions of an individual so long as it is not conveyed that compliance with any requests is required." *Id.*, ¶ 23. Because we made these statements in the context of determining whether Ingersoll's counsel was ineffective and were not asked to decide whether his consent was valid, the statements have little precedential value.

zures be reasonable under all the circumstances. Under all the circumstances presented in Mr. O'Boyle's case, we hold that the detention and search were unreasonable and his consent was not voluntary. The detention and search, therefore, violated article 1, § 4 and the district court erred in denying Mr. O'Boyle's motion to suppress.

[¶ 66] In the context of the Fourth Amendment, we reaffirm the rule established in *Terry*, 392 U.S. at 19–20, 88 S.Ct. 1868—questioning during a traffic stop must be limited to the purpose of the stop and may not be extended unreasonably beyond the scope of the stop absent valid consent, a reasonable suspicion of other illegal activity, or officer safety concerns. Applying these standards, we hold under the totality of the circumstances the questioning inside the patrol car unreasonably exceeded the scope of the traffic stop and violated the Fourth Amendment. Mr. O'Boyle's consent to additional questioning outside the patrol car and his consent to the search were not sufficiently voluntary to remove the taint of the initial unconstitutional detention. Therefore, evidence obtained after his consent should have been suppressed as fruit of the poisonous tree.

[¶ 67] The order denying the suppression motion is reversed, and this case is remanded to the district court to allow Mr. O'Boyle to withdraw his guilty plea pursuant to W.R.Cr.P. 11(a)(2).

VOIGT, Justice, specially concurring.

[¶ 68] I agree with the rationale and result of the majority opinion. I write separately to make a couple of statements about traffic stop jurisprudence. I start with what I perceive to be the misapplication of the principles of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) to traffic stops. In *Terry*, a downtown "beat" detective with thirty-nine years' experience observed the suspicious activity of three men, who appeared to be "casing" a store for a "stick up...." *Id.* at 5–6, 88 S.Ct. 1868. Although he had not seen anything illegal, the detective approached the three men to investigate the situation and, upon confronting them, patted them down for weapons.

*Id.* at 6–7, 88 S.Ct. 1868. Terry was eventually convicted of carrying a concealed weapon. *Id.* at 4, 88 S.Ct. 1868.

[¶ 69] *Terry* sired, or at least is the defining justification for, the "investigative stop" or "Terry stop" that falls somewhere short of arrest in the scale of police/citizen encounters. Over the years, *Terry* has become synonymous with "investigative detention." In fact, however, the propriety of an "investigative detention" was not the focus of the case:

> The crux of this case, however, is not the propriety of Officer McFadden's taking steps to investigate petitioner's suspicious behavior, but rather, whether there was justification for McFadden's invasion of Terry's personal security by searching him for weapons in the course of that investigation.

*Id.* at 23, 88 S.Ct. 1868.

[¶ 70] The issue in *Terry* was not the constitutional reasonableness of brief citizen detentions for investigative purposes. Rather, in affirming Terry's conviction and the denial of his motion to suppress as evidence the revolver found in his overcoat, the United States Supreme Court focused on the patdown search for weapons:

> [W]e turn our attention to the quite narrow question posed by the facts before us: whether it is always unreasonable for a policeman to seize a person and subject him to a limited search for weapons unless there is probable cause for an arrest.

*Id.* at 15, 88 S.Ct. 1868.

[¶ 71] The point is this: *Terry* was a "stop and frisk" case; nothing more, nothing less. By its own terms, it did not create or identify a special area of investigative immunity from Fourth Amendment principles:

> Nothing we say today is to be taken as indicating approval of police conduct outside the legitimate investigative sphere. Under our decision, courts still retain their traditional responsibility to guard against police conduct which is overbearing or harassing, or which trenches upon personal security without the objective evidentiary justification which the Constitution requires. When such conduct is identified, it

must be condemned by the judiciary and its fruits must be excluded from evidence in criminal trials.

*Id.*

[¶ 72] But even if *Terry* did validate the "Terry stop" concept that the brief detention of a citizen for the purpose of investigating suspicious behavior is constitutionally reasonable, what does that have to do with a traffic stop? In the instant case, when Trooper Peech saw the appellant speeding past him at seventy-nine mph in a seventy-five mph zone, what was there to investigate? The purpose of the ensuing traffic stop certainly was not to investigate anything. The purpose was to give the appellant a speeding ticket.

[¶ 73] What has happened is that *Terry* has been stretched far beyond its self-declared boundaries to justify a secondary investigation having nothing to do with the reason for the initial encounter. That leads me to my second point. The majority cites to and quotes from many cases where various courts, both state and federal, have approved the practice of law enforcement officers inquiring into motorists' travel plans during traffic stops. Those courts and others have found such questioning to be reasonable under the circumstances. A recent example is *People v. Williams*, 472 Mich. 308, 696 N.W.2d 636 (2005), where that state's Court of Appeals had reversed Williams' drug conviction on the ground that, although the initial traffic stop for speeding eighty-eight mph in a seventy mph zone was lawful,

the trooper "unlawfully exceeded the initial stop when he asked defendant to step out of the vehicle" to answer questions about his travel plans while the officer possessed only a "generalized hunch" that criminal activity was afoot. The trooper's questions had no relevance to the traffic stop, the Court held, and he had no reasonable suspicion of criminal activity to warrant asking the questions. The Court concluded that Trooper Varoni was acting on a "hunch," which is insufficient grounds for pursuing an investigatory stop.

*Id.* at 639–40.

[¶ 74] The Michigan Supreme Court reversed the Court of Appeals and reinstated Williams' conviction for possession of drugs found during the search of his car. In doing so, the higher court relied upon the two-part standard of *Terry*, 392 U.S. at 20, 88 S.Ct. 1868: whether the officer's action was justified at its inception and whether it was reasonably related in scope to the circumstances that justified the stop in the first place. *Williams*, 696 N.W.2d at 640. Finding no dispute that the first part of the test was satisfied because the stop was occasioned by the appellant's speeding, the Michigan Supreme Court had this to say about the second part of the test:

A traffic stop is *reasonable* as long as the driver is detained only for the purpose of allowing an officer to ask *reasonable* questions concerning the violation of law and its context for a *reasonable* period. The determination whether a traffic stop is *reasonable* must necessarily take into account the evolving circumstances with which the officer is faced.

*Id.* at 641 (emphasis added and footnote omitted). That enunciated rule of law is supported by a footnote that reads as follows:

There is considerable discretion allowed an officer charged with enforcing the traffic laws as a member of the executive branch of government. This discretion can be exercised effectively only if an officer is allowed to ask *reasonable* questions concerning the context of a traffic offense. To deny an officer the ability to ask *reasonable* questions, *reasonably* circumscribed in scope and duration, is to deny the officer the ability to *reasonably* exercise the officer's discretion.

*Id.* at 641 n. 8 (emphasis added).

[¶ 75] What follows in *Williams* is an explication of the stated justification for inquiry into speeding motorists' travel plans:

It is no violation of the Fourth Amendment for an officer to ask *reasonable* questions in order to obtain additional information about the underlying offense and the circumstances leading to its commission. For example, in addition to asking for the necessary identification and paperwork, an officer may also ask questions relating to the reason for the stop, including questions about the driver's destination

and travel plans. *United States v. Williams*, 271 F.3d 1262, 1267 (C.A.10, 2001). Specifically, an officer may ask about the "purpose and itinerary of a driver's trip during the traffic stop" in order to determine whether a "violation has taken place, and if so, whether a citation or warning should be issued or an arrest made." *United States v. Brigham*, 382 F.3d 500, 508 (C.A.5, 2004). Such inquiries are "within the scope of investigation attendant to the traffic stop." *Id.*

*Williams*, 696 N.W.2d at 641 (emphasis added and footnote omitted).

[¶ 76] This is the fallacious argument, in my view. To begin with, and the reason for all the highlighted "reasonables," in the above quotes, is that calling something reasonable does not make it so, even when done repeatedly. It is simply not reasonable to ask a motorist who had the misfortune of going seventy-nine mph in a seventy-five mph zone in Wyoming the name of his son's college mascot, because the answer to that question is simply not related to the four-mile-per-hour excess. In truth, the situation would be rare indeed where the citizen's itinerary and destination had anything whatsoever to do with the question of whether a speeding violation had occurred.

[¶ 77] The Michigan Court of Appeals had it right: *Terry* does not authorize questioning about travel plans based on a hunch that something criminal may be afoot. "Anything less [than an objective standard of reasonableness] would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction." *Terry*, 392 U.S. at 22, 88 S.Ct. 1868. Both the United States Constitution and the Wyoming Constitution forbid unreasonable searches and seizures. An unreasonable seizure occurs when a motorist is detained for any length of time for the purpose of an interrogation that has nothing to do with the traffic stop and is not based in a reasonable and articulable suspicion of criminal activity. That is what happened here.

[¶ 78] It is intellectually dishonest in writing judicial opinions to pretend that something is what it is not. Any credible law enforcement officer will admit that the interrogation of motorists and their passengers has absolutely nothing whatever to do with the speeding violation or other reason for the "traffic" stop. The purpose behind the interrogation is to uncover discrepancies or other information that may eventually justify a search of the vehicle for controlled substances. *See* 4 Wayne R. LaFave, *Search and Seizure* § 9.3(d)-(e) (4th ed.2004). These cases are not traffic cases; they are drug interdiction cases. Perhaps if the appellate courts of America would treat them as such, the discussion would be less phony. The real question should be, given the major drug problem facing this country and the huge amount of drugs being transported on our nation's highways, what investigatory steps directed at drug interdiction are constitutionally reasonable in a traffic stop situation. Would that not be better than pretending that the name of the motorist's son's college mascot is somehow relevant to a speeding violation?

[¶ 79] Finally, I will say this. The majority details the law that has developed in this area, and it is apparent that the courts are "all over the board." Decisions range from *United States v. Malouff*, 114 Fed.Appx. 975, 979 (10th Cir.2004) ("an officer may question a traffic-stop detainee on any topic without reasonable and articulable suspicion so long as the questioning does not prolong the stop") to *State v. Carty*, 170 N.J. 632, 790 A.2d 903, 912, *modified on other grounds*, 174 N.J. 351, 806 A.2d 798 (2002) (even a consent search after a traffic stop requires reasonable and articulable suspicion of criminal activity). The lure of the latter bright-line standard intensifies as the officer's conduct approaches that "overbearing or harassing" police conduct reserved for condemnation by *Terry*, 392 U.S. at 15, 88 S.Ct. 1868. The litany of questions posed by Trooper Peech to the appellant in this case comes mighty close to that line.