2007 WY 155

**Guillermo MARQUEZ–GUITIERREZ,**
**Appellant (Defendant),**

v.

**The STATE of Wyoming,**
**Appellee (Plaintiff).**

**No. 06–117.**

Supreme Court of Wyoming.

Sept. 26, 2007.

Representing Appellant: D. Terry Rogers, State Public Defender; and Donna D. Domonkos, Appellate Counsel. Argument by Ms. Domonkos.

Representing Appellee: Patrick J. Crank, Wyoming Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Paul S. Rehurek, Senior Assistant Attorney General. Argument by Mr. Rehurek.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

HILL, Justice.

[¶ 1] After approximately 180 pounds of marijuana were discovered in the van in which Guillermo Marquez–Guitierrez was a passenger, he was arrested. A jury found Marquez–Guitierrez guilty on three counts of drug-related charges. He claims that the district court erred in denying his motion to suppress the marijuana because he was illegally detained and there was no reasonable suspicion present. We hold that the district court did not err, and affirm.

## ISSUES

[¶ 2] Marquez–Guitierrez phrases the issue as follows:

Did the District Court err in Denying [Marquez–Guitierrez's] Motion to Suppress the Evidence When [he] was Illegally detained and There was no Reasonable Suspicion to Detain [him] Until he Consented to A Search of His Vehicle?

## FACTS

[¶ 3] On November 19, 2004, Wyoming State Trooper Scimone was on duty, traveling westbound on I–80 in Albany County, Wyoming. He observed a Ford Econonline van without a front license plate traveling eastbound. As the van passed, Trooper Scimone noticed that the van had a rear plate from Illinois. Recognizing that Illinois requires both front and rear plates, the trooper turned around to apprehend the van. Upon reaching the van, Trooper Scimone first confirmed that it did not have a front plate. Then the trooper noticed that the van had substantially decreased its speed, from about 73 mph when he first observed it, to 63–65 mph. The trooper then watched the van weave inside its own lane, drive onto the fog line, and then over the center dividing line. After monitoring the van for some time, the trooper initiated a traffic stop at 4:14 p.m.

[¶ 4] As he approached the passenger side of the vehicle, the trooper noticed Marquez–Guitierrez in the passenger seat. Neither he nor the driver, Chris Cardona, made eye contact with the trooper. Cardona provided Trooper Scimone with a driver's license and registration, but no proof of insurance was produced. As Cardona passed the documentation over Marquez–Guitierrez, the trooper noticed both men's hands shaking.

[¶ 5] Cardona then accompanied Trooper Scimone back to his patrol car. The trooper went back to the van and proceeded to ask Marquez–Guitierrez a few questions. He informed Trooper Scimone that the two men were from the Los Angeles area and that they were on their way to Illinois to drop off the van and visit relatives. Marquez–Guitierrez also told the trooper that the van belonged to someone else, and that neither he nor Cardona knew the city they were traveling to, only the exit number off of I–80, which was their destination. During their conversation, Trooper Scimone also noticed a cell phone in the center console and air fresheners throughout the van.

[¶ 6] Meanwhile, during Trooper Scimone's and Marquez–Guitierrez's conversation, Trooper Mann arrived. After the conversation with Marquez–Guitierrez ended, Trooper Scimone asked Trooper Mann to call for a drug dog. At this point, Trooper Scimone reasoned that he wanted the dog there in case there was consent to search—in other words, asking for the dog at this point in the stop would simply save some time.

[¶ 7] Trooper Scimone then returned to his patrol car, which was still occupied by Cardona. He ran an NCIC check on the van, and a warrant check for both travelers. He also processed paperwork for the warning ticket he planned to issue to Cardona. During these several minutes of paperwork, Trooper Scimone and Cardona made small talk about cars, football, and Wyoming wildlife. Interspersed in the conversation were a couple of travel questions, to which Cardona responded that he was simply helping to drive, but that he did not know who owned the van. Fourteen minutes into the stop, at 4:28 p.m., Trooper Scimone asked Trooper Mann to return Cardona's documentation, and then informed him, "Things will get wrapped up in a second."

[¶ 8] However, Trooper Scimone was not done questioning Cardona. He asked him if there were any drugs or alcohol in the van. Cardona denied there being any drugs or alcohol present. Next, the trooper informed Cardona that he was going to issue a warning ticket for having no front license plate or proof of insurance and for weaving. At 4:31 p.m., the trooper told Cardona they could be on their way, and that they were "good to go."

[¶ 9] As Cardona exited the patrol car, he asked Trooper Scimone what he needed to do about the warning ticket. The trooper told him to simply consider the ticket a "souvenir" and nothing needed to be done about it. The trooper then asked Cardona if he could ask him a few more questions, to which he agreed. The trooper asked to search the vehicle and Cardona agreed. He was told a dog would be there soon to "take a quick sniff," and that the men could be on their way.

[¶ 10] While waiting for the dog, Trooper Scimone asked more questions relating to paperwork for the consent search, what Cardona did for a living, and the presence of drugs in the vehicle. Eventually, Marquez–

Guitierrez also returned to the vehicle. Neither Marquez–Guitierrez nor Cardona attempted to revoke the consent to search.

[¶ 11] Approximately thirty-three minutes after the vehicle was pulled over, and approximately sixteen minutes after the consent to search was given, the drug dog arrived. The dog indicated the presence of drugs both outside and inside the van. The ensuing search of the van revealed approximately 180 pounds of marijuana, which was packaged and concealed between the roof and the interior headliner. Both men were immediately arrested and charged with three counts of drug-related charges.[1]

[¶ 12] Following a jury trial, Marquez–Guitierrez was found guilty of all three charges and sentenced. On January 26, 2006, he timely appealed the Judgment and Sentence that was entered on January 10, 2006, specifically challenging the denial of his *Motion to Suppress.*

## STANDARD OF REVIEW

[¶ 13] Our standard of review when analyzing the denial of a motion to suppress is well known:

> Rulings on the admissibility of evidence are within the sound discretion of the trial court. We will not disturb such rulings absent a clear abuse of discretion. An abuse of discretion occurs when it is shown the trial court reasonably could not have concluded as it did. Factual findings made by a trial court considering a motion to suppress will not be disturbed unless the findings are clearly erroneous. Because the trial court has the opportunity to hear the evidence, assess witness credibility, and draw the necessary inferences, deductions, and conclusions, we view the evidence in the light most favorable to the trial court's determination. Whether an unreasonable search or seizure occurred in violation of constitutional rights presents a question of law and is reviewed de novo.

*Dettloff v. State,* 2007 WY 29, ¶ 11, 152 P.3d 376, 381 (Wyo.2007) (citations omitted).

## ARGUMENT

[¶ 14] Marquez–Guitierrez claims on appeal that because he had no reasonable suspicion of illegal activity, Trooper Scimone impermissibly expanded the scope of the traffic stop, that the consent to search the vehicle was tainted by the illegal detention, and that these errors violated both the federal and state constitutions.[2] The State responds that the detention was permissible under both constitutions because the trooper had a reasonable suspicion of criminal activity based upon the totality of the circumstances, including that "overcompensation" of reducing the vehicle's speed to well-below the speed limit, extreme nervousness on the parts of both the driver and Marquez–Guitierrez, presence of multiple air fresheners in the van, and the unusual travel plans of the men.

### *State Constitutional Analysis*

[¶ 15] Article 1, § 4 of the Wyoming Constitution requires searches and seizures to be reasonable under all of the circumstances. *O'Boyle v. State,* 2005 WY 83, ¶ 26, 117 P.3d 401, 409 (Wyo.2005). Whether a search or seizure is reasonable is a question of law to be decided from the totality of the circumstances. *Id.* ¶ 25, 117 P.3d at 409. Accordingly, we must analyze the reasonableness of the detention under *all* of the circumstances, and whether or not the trooper had reasonable suspicion to justify the intrusive measures used.

[¶ 16] The district court held that the detention was reasonable here because the observations made by the trooper supported his reasonable suspicion and allowed for continued detention. Those observations included: (1) both the driver's and passenger's refusal to look at the trooper while he was traveling beside them and that they slowed to well

1. The charges were: (1) Possession with intent to deliver a controlled substance, marijuana, in violation of Wyo. Stat. Ann. § 35–7–1031(a)(ii) (LexisNexis 2007); (2) Possession of a controlled substance, marijuana, in violation of Wyo. Stat. Ann. § 35–7–1031(c)(iii) (LexisNexis 2007); and (3) Conspiracy to deliver a controlled substance,

marijuana, in violation of Wyo. Stat. Ann. §§ 35–7–1031(a)(ii) and 35–7–1042 (LexisNexis 2007).

2. The driver of the vehicle, Cardona, consented to the search of the vehicle.

below the speed limit; (2) both the driver and passenger having "extreme nervousness;" (3) the presence of multiple air fresheners; (4) the presence of black duffel bags in the rear of the vehicle; (5) the driver's and passenger's confusion as to their destination; (6) the inability of both the driver and passenger to produce more information as to their destination other than an exit number; and (7) the fact that they were traveling from a source city (Los Angeles) to a destination area (the Midwest).

[¶ 17] The district court also commented on the trooper's questions during the initial stop. The court stated:

Trooper Scimone clearly asked questions that were in no way related to the purpose of the stop, but most of these were asked while he was completing the paperwork on the warning tickets. While these questions may have been utilized to prolong the length of the stop in some small part, they were not utilized in forming any reasonable suspicion to proceed with the detention. While *Campbell [v. State,* 2004 WY 106, ¶ 12, 97 P.3d 781, 785 (Wyo.2004) ] stands for the rule that 'an officer generally may not ask the detained motorist questions unrelated to the purpose of the stop,' *Id.* at ¶ 12. *Campbell* was addressing a question about controlled substances, not idle chit chat. This Court believes it would be stretching *Campbell* too far to say that an officer cannot engage in idle conversation while awaiting the arrival of a K–9 in a situation where that officer already had reasonable suspicion to proceed with the detention.

■ [¶ 18] We agree with the district court. In fact, we recently said in *Marinaro*

*v. State,* 2007 WY 123, ¶ 8, 163 P.3d 833, 835 (Wyo.2007) [3]:

In that regard, we will further note that the United States Supreme Court held in *Muehler v. Mena,* 544 U.S. 93, 100–101, 125 S.Ct. 1465, 1470, 161 L.Ed.2d 299 (2005) that, during the course of a legal detention of an individual, law enforcement officers may pose questions to that person that are unrelated to the underlying purpose of the seizure and that are not independently justified by reasonable suspicion. Following *Muehler,* the Tenth Circuit Court of Appeals recently held that suspicionless questioning of a motorist by a law enforcement officer during the course of a traffic stop regarding weapons and contraband is not a Fourth Amendment violation so long as it does not extend the duration of the traffic stop. *United States v. Stewart,* 473 F.3d 1265, 1268–69 (10th Cir.2007).

[¶ 19] Marquez–Guitierrez contends that Cardona was improperly removed from the van and placed in the patrol car. At that point, Marquez–Guitierrez contends that no reasonable suspicion existed, and the trooper was embarking on a "fishing expedition" to find reasonable suspicion. Yet, even prior to the trooper's removal of Cardona,[4] the record shows that the trooper had noticed that the vehicle slowed to well below the acceptable speed limit; that both men were extremely nervous;[5] that there were multiple air fresheners present; and that there were large black duffel bags in the rear of the vehicle. Upon further discussion with Cardona in the patrol car, the trooper was then able to discern more information that further added to his already articulable reasonable suspicion.

---

3. We note that the cases mentioned in this citation involved federal, not state, constitutional claims.

4. Typically, a reasonable investigation of a traffic stop may include asking for the driver's license and registration, requesting the driver to sit in the patrol car, and asking the driver about his destination and purpose. *United States v. Ramos,* 42 F.3d 1160, 1163 (8th Cir.1994). *See also Pennsylvania v. Mimms,* 434 U.S. 106, 111 n. 6, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); *State v. Butcher,* 137 Idaho 125, 131, 44 P.3d 1180, 1186 (Idaho App.2002) ("During a lawful traffic stop,

the officer may instruct the driver to exit the vehicle or to remain inside. This procedure is within the police officer's discretion and is not otherwise unlawful.")

5. "It is generally accepted that nervousness upon the initial confrontation is normal and the telling information is whether the citizen calmed after the initial few minutes of the encounter. Extreme and continued nervousness, however, 'is entitled to somewhat more weight.'" *Damato v. State,* 2003 WY 13, ¶ 21, 64 P.3d 700, 708 (Wyo. 2003) (citations omitted).

[¶ 20] From our review of the record, we conclude that the district court's conclusion is supported by the evidence presented below. The totality of the circumstances in this case accumulated in such a way that the trooper became increasingly suspicious that both the driver and passenger of the vehicle were involved in illegal activity. Although any of these circumstances alone may not have justified the detention, *all* of them together support the conclusion that Trooper Scimone had reasonable suspicion to believe criminal activity was afoot, thus warranting the further detention and that detention did not violate the Wyoming Constitution.

[¶ 21] Before leaving this issue, we address, as we did in *Negrette v. State*, 2007 WY 88, ¶ 17, 158 P.3d 679, 683 (Wyo.2007) that Marquez–Guitierrez substantially relies on *O'Boyle* to support his argument that his detention was unreasonable. We said about *O'Boyle*,

> In *O'Boyle*, a driver was stopped for going four miles per hour over the speed limit and then was questioned extensively about subjects having nothing to do with the reason for the stop or his travel plans, including what courses his son was taking in college, whether he lived on campus and the name of the college mascot. The obtrusive questioning in *O'Boyle* occurred despite the trooper's admission that he did not have a reasonable suspicion of other criminal activity beyond the speeding violation.

*Negrette*, ¶ 17, 158 P.3d at 683. As in *Negrette*, *O'Boyle* is also distinguishable in this case "both by the extensiveness of the questioning and the absence of a reasonable suspicion of criminal activity." *Id.* Here, Trooper Scimone asked a limited number of questions that were relatively restrained in their subject matter. Unlike the sixty questions asked in *O'Boyle*, many of which were unrelated to the stop, the trooper here asked questions that were for the most part related to travel plans. Also, those questions were, in part, based upon the trooper's general doubts about their travel plans, given

that two California residents were driving a van cross-country that neither one owned, had any connection with, and were only traveling to an exit number. Neither Cardona nor Marquez–Guitierrez was subjected to "persistent and sustained questioning that unreasonably expanded the scope of the stop." *O'Boyle*, ¶ 32, 117 P.3d at 412. *O'Boyle* is factually unlike this case and does not support Marquez–Guitierrez's argument.

[¶ 22] We next turn to Marquez–Guitierrez's contention that his consent to the search of his vehicle was involuntary. Specifically, he argues that his consent was involuntary because it was preceded by an unlawful detention. This argument fails because we have already held that the detention prior to consent was lawful. We reasoned in *O'Boyle* that:

> A waiver of constitutional rights under our constitution must appear by clear and positive testimony, and, if a search or seizure is based upon the proposition that consent was given, there should be no question from the evidence that consent was 'really voluntary and with a desire to invite search, and not done merely to avoid resistance.' Acquiescence and nonresistance have not been deemed sufficient under Wyoming law to establish consent.

*O'Boyle*, ¶ 38, 117 P.3d at 412.

[¶ 23] Here, consent to search was actually given by the driver, not Marquez–Guitierrez. However, because both Marquez–Guitierrez and Cardona had apparent authority over the van,[6] we consider this issue here. Marquez–Guitierrez argues that because "Trooper Scimone never told Mr. Cardona he could refuse to answer the additional questions, could refuse the search, or that he was free to leave," that his acquiescence to the search did not actually constitute consent, per *O'Boyle*. *O'Boyle*, ¶ 44, 117 P.3d at 413. Contrary to Marquez–Guitierrez's argument, Trooper Scimone did tell Cardona that he was free to go and, in fact, opened the patrol car so that he could exit the vehicle.

[¶ 24] It is also evident that the consent was voluntary, given the facts that are borne

---

**6.** While Cardona was in the driver's seat of the van when it was stopped, it was clear that both were driving to Illinois, that neither man claimed

to be "in charge" of the vehicle, and that neither man actually owned the vehicle but were both using it with permission of the owner.

out by the record. First, at the time Trooper Scimone requested permission to search, all documents had been returned to both men. Marquez–Guitierrez was in the van, and Cardona was told he was free to go—*he* extended the interaction between himself and Trooper Scimone by asking a question about the warning ticket. It was at that juncture that the trooper asked Cardona if he could ask him a couple more questions. Cardona agreed, and then agreed to the trooper's request to search the van. Cardona himself testified at the suppression hearing that Trooper Scimone released him before requesting consent to search, that the trooper was easy-going and non-threatening, and that he was not coerced or intimidated into giving consent. Accordingly, no constitutional violation occurred.

### *Federal Constitutional Analysis*

[¶ 25] We have described our Fourth Amendment analysis as follows:

> In determining whether a traffic stop detention was reasonable under the Fourth Amendment, we apply the two-part inquiry established in *Terry v. Ohio,* 392 U.S. at 19–20, 88 S.Ct. 1868 [20 L.Ed.2d 889], that is: 1) was the initial stop justified, and 2) were the officer's actions during the detention "reasonably related in scope to the circumstances that justified the interference in the first instance[?]" In making this inquiry, the U.S. Supreme Court has rejected bright-line rules and focused instead on a fact-specific reasonableness inquiry. Under the Fourth Amendment, the government has the burden of demonstrating that a seizure was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.

*O'Boyle,* ¶ 46, 117 P.3d at 414 (citations omitted).

[¶ 26] Marquez–Guitierrez does not challenge the appropriateness of the initial stop. Our analysis, therefore, centers on whether or not the trooper's actions during the detention were reasonably related in scope to the circumstances justifying the interference in the first place. We have summarized the standards applicable under this prong of the

*Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) analysis as follows:

> An officer's actions during a traffic stop must be reasonably related to the purpose of the stop. Absent valid consent, a reasonable suspicion of other unlawful activity or reasonable suspicion. that a detainee is armed, an officer may not expand an investigative detention beyond the scope of the stop, ask questions unrelated to the stop or "embark on a fishing expedition in the hope that something will turn up." The relevant question is whether the scope of the stop was reasonable under the totality of the circumstances, and the burden of proving reasonableness lies with the government.

*O'Boyle,* ¶ 49, 117 P.3d at 415 (citations omitted).

[¶ 27] After being stopped for not having two license plates as necessitated by Illinois law, Marquez–Guitierrez was seized within the meaning of the Fourth Amendment. We must determine under the totality of the circumstances whether or not the trooper's actions during the detention were reasonably related in scope to the stop.

[¶ 28] In making this determination, we are guided by the following principles: 1) A detention must be carefully tailored to the reason for the stop; 2) an officer may request the detainee's driver's license, proof of insurance, and vehicle registration or rental papers, run a computer check and issue a citation or warning; 3) an officer may make reasonable inquiry into travel plans to the extent necessary to put the traffic violation in context; 4) absent reasonable suspicion of other illegal activity or that a detainee is armed, the officer may not ask questions unrelated to the stop; and 5) an officer may expand the scope of the detention only with valid consent or a reasonable suspicion of other illegal activity or that the detainee is armed. *O'Boyle,* ¶ 55, 117 P.3d at 416.

[¶ 29] Here, we conclude that the scope of the detention initially was appropriately tailored to the reason for the stop. Before obtaining consent to search or deploying the drug dog, Trooper Scimone knew that both men were California residents, were occupants of a van registered in Illinois, that neither man owned the van, and that they

were traveling to an exit number on the interstate. This, combined with their nervousness, the presence of air fresheners, overcompensation in reducing the driving speed, and avoidance of eye contact, amounted to reasonable suspicion enough to justify Trooper Scimone's decision to expand the scope of the stop. Accordingly, we hold that the detention did not violate the Fourth Amendment to the United States Constitution.

[¶ 30]  We affirm the district court's order denying the motion to suppress, as we do the judgment and sentence.