**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4731-17T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JAMES J. KERNS, a/k/a JAMES J.
KERNS II, JAMES J. KERNS III,
JAMES J. KERNS 3RD, JAMES
JOHNLITY KERNS, and MILLS,

    Defendant-Appellant.

_____

Argued December 9, 2019 – Decided December 30, 2020

Before Judges Messano, Ostrer and Susswein
(Judge Ostrer concurring).

On appeal from the Superior Court of New Jersey, Law
Division, Warren County, Indictment Nos. 17-01-0050
and 17-01-0051.

Emma R. Moore, Assistant Deputy Public Defender,
argued the cause for appellant (Joseph E. Krakora,
Public Defender, attorney; Emma R. Moore, of counsel
and on the briefs).

Adam D. Klein, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Adam D. Klein, of counsel and on the brief).

PER CURIAM

In this consolidated appeal, James J. Kerns contends the trial court should have granted his motions to suppress drugs that police seized from his person on two separate occasions. After evidentiary hearings, the court denied the motions, and Kerns pleaded guilty to two counts of third-degree possession of a controlled dangerous substance (CDS), one count from each incident. The court imposed concurrent terms of forty-two months.

In the first incident, Kerns was a passenger in a car that police stopped for motor vehicle violations. Kerns contends police unlawfully asked him to identify himself. Kerns provided false names to police, who arrested him for hindering. Incident to his arrest, police seized heroin from his person.[1] Kerns contends the police's unlawful inquiry tainted the seizure that followed. He argues:

> BECAUSE MR. KERNS WAS MERELY A
> PASSENGER IN A CAR STOPPED FOR A TRAFFIC
> VIOLATION, TROOPER MURRAY DID NOT HAVE
> AUTHORITY TO ASK FOR HIS IDENTIFICATION.

---

[1] This incident led to Indictment No. 17-01-0050, charging one count of third-degree possession of CDS, N.J.S.A. 2C:35-10(a)(1).

BECAUSE THIS CREDENTIALS CHECK VIOLATED ARTICLE 1 PARAGRAPH 7 OF THE NEW JERSEY CONSTITUTION, THE EVIDENCE SUBSEQUENTLY SEIZED MUST BE SUPPRESSED.

After Kerns's release on bail, a cooperating witness engaged in two controlled buys from him. Then, tipped off that Kerns was about to travel to Newark to buy drugs, police surveilled Kerns make the round-trip from Phillipsburg. On his return, police arrested Kerns and, incident to the arrest, seized more heroin and MDMA (which is short for methylenedioxymethamphetamine, and popularly known as "Ecstasy").[2] Kerns contends those drugs should have been suppressed because the controlled buys did not create probable cause for the arrest; and even if they did initially, the probable cause had become stale. He argues:

BECAUSE THE STATE DID NOT ESTABLISH THAT THE OFFICERS HAD PROBABLE CAUSE TO ARREST MR. KERNS ON SEPTEMBER 22, 2016, THE EVIDENCE OBTAINED IN THE

---

[2] This incident led to Indictment No. 17-01-0051, consisting of eleven counts charging offenses related to the two controlled buys as well as the seizure after Kerns's round-trip to Newark. The indictment included four counts of third-degree possession of CDS, N.J.S.A. 2C:35-10(a)(1); four counts of third-degree possession with intent to distribute CDS, N.J.S.A. 2C:35-5(a)(1), -5(b)(3); two counts of third-degree distribution of CDS, N.J.S.A. 2C:35-5(a)(1), -5(b)(3); and one count of second-degree distribution of CDS within 500 feet of public housing, N.J.S.A. 2C:35-7.1(a).

SEARCH INCIDENT TO THAT ARREST MUST BE SUPPRESSED.

A.    The Police's Limited Knowledge of the Controlled Buys.

B.    The Gap Between the Controlled Buys and Eventual Arrest.

Having reviewed Kerns's arguments in light of the record and applicable principles of law, we reverse the first order and affirm the second. Only the motion regarding the first indictment merits extended discussion.

I.

A.

We defer to the trial court's limited factual findings regarding the first incident, because they were supported by substantial credible evidence in the record — the testimony of New Jersey State Trooper Robert Murray, the sole witness at the suppression hearing, and a motor vehicle recording of the traffic stop. See State v. Elders, 192 N.J. 224, 243-44 (2007) (describing standard of review of suppression orders). However, relying on the undisputed video record, we are constrained to make additional findings regarding facts that the trial court did not address. Cf. State v. S.S., 229 N.J. 360, 380 (2017) (stating appellate court may not substitute its findings for those the trial court made based on video recording).

The trial court found that Trooper Murray and his partner, Trooper J. Almeida, observed a vehicle with Pennsylvania tags cross the free bridge into Phillipsburg shortly after midnight. One headlight was out, and the car was going 25 mph in a 15-mph zone. During the traffic stop, a trooper asked Kerns, the front seat passenger, for his identification. The court found: "When asked for his identification, defendant stated that he did not have his driver's license on his person and proceeded to provide Trooper Murray with several false names and a false DOB." The troopers checked those names in the computer system and "[n]o results were produced." Trooper Murray then ordered Kerns to exit the vehicle and arrested him for hindering an investigation, N.J.S.A. 2C:29-3(b). An initial search of his person uncovered nothing. The trooper transported Kerns to the State Police station. When he removed Kerns from his police vehicle, Kerns held in his hands seventy-eight wax folds of suspected heroin.

The court held, as a matter of law, that Kerns was free not to answer the trooper's question. In the court's view, Kerns himself prompted further questioning and his ultimate arrest by providing false names. Citing State v. Sirianni, 347 N.J. Super. 382, 387 (App. Div. 2002), the court evidently concluded that the troopers' encounter with Kerns was a field inquiry; consequently, the police did not need reasonable grounds or suspicion, and

5

Kerns was free not to answer.  Id. at 388-89.  On appeal, the State takes that same position, as its first line of defense of the court's order.

We owe no deference to the trial court's legal conclusion, State v. Watts, 223 N.J. 503, 516 (2015), which mischaracterized the trooper's encounter with Kerns.  In Sirianni, a police officer approached a person in a parked car and asked for identification.  The person was not detained; he was free not to answer; and the police inquiry did not convert what was a field inquiry into a detention.  Sirianni, 347 N.J. Super. at 391.  By contrast, Kerns and the driver were already seized, because "[m]otor vehicle stops are seizures for Fourth Amendment purposes," State v. Atwood, 232 N.J. 433, 444 (2018), and during a traffic stop, "the passenger, like the driver" is seized, State v. Sloane, 193 N.J. 423, 426 (2008).  Kerns was not free to leave.  As the Court observed in State v. Rosario, 229 N.J. 263, 273 (2017), "[i]t defies typical human experience to believe that one who is ordered to produce identification [when the officer has boxed in a person's vehicle] would feel free to leave."

The video makes clear that Kerns was commanded to produce identification documents and, because he was unable to do that, to state his name and date of birth.  When an officer asks a person "if he ha[s] 'any identification on [him],'" the United States Supreme Court understood that "as a request to

6

produce a driver's license or some other form of written identification."  Hiibel

v. Sixth Judicial Dist. Ct. of Nevada, Humboldt Cty., 542 U.S. 177, 181 (2004)

(second alteration in original).  Although the trial court found that police "asked"

Kerns for identification, Kerns was not free to refuse, just as he was not free to

leave.  That Kerns was seized is one reason we conclude, as a legal matter, that

an objectively reasonable person under the circumstances would not feel free to

refuse.  See State v. Gibson, 218 N.J. 277, 291-92 (2014) (stating that a field

inquiry involves questioning that is not "harassing, overbearing, or accusatory

in nature," and the person is free to refuse and terminate the encounter, but an

investigative stop is one where a reasonable person would not feel free to leave).

But, the trooper left nothing to doubt.  The video recorded Trooper Murray ask

Kerns if he had identification.  Kerns answered inaudibly, Trooper Murray asked

for clarification, and then commanded, "Give the trooper [referring to Trooper

Almeida] your name."[3]

The video recording reflects that in the beginning of the stop, Trooper

Murray informed the driver that he was pulled over because his headlight was

---

[3]  We may not substitute our assessment of video recordings for the trial court's, see S.S., 229 N.J. at 380, and we do not do so here.  The trial judge did not make findings regarding this exchange or others we address, or expressly refer to them.

not functioning, and he went 25 mph in a 15-mph zone. The trooper asked the driver for his license and registration. He produced the first, but could not locate the second. Trooper Murray assured the driver that he could confirm the driver's ownership by running the plates; and cordially stated that the driver would likely locate the registration after the police left.[4]

While Trooper Murray engaged with the driver, Trooper Almeida continued to question Kerns to ascertain his identity. Both troopers returned to the patrol car to look up the name Kerns gave, and finding nothing, Trooper Murray walked back to Kerns to ask for clarification. The trooper returned to the patrol car a second time, and again could find no match. The troopers walked back to Kerns, who clarified the spelling of his name, and Trooper Murray asked why Kerns had not done so earlier. The troopers returned to the patrol car a third time. By that point, nearly fifteen minutes had elapsed since the stop began. The first video ends with both troopers in their vehicle.[5] By that point,

---

[4]  In its written opinion, the trial court recited that the State asserted, and defendant denied, that the driver "was unable to provide proof of ownership." The court did not expressly decide that dispute, and the video recording does not clearly resolve it.

[5] The dvd included in the appendix on appeal includes a second video recording, which apparently picks up after the first. However, the State expressly introduced only the first at the hearing.

no one wrote out traffic summonses for the driver. Trooper Murray testified that after a fourth encounter with Kerns regarding his identity, he arrested Kerns for hindering.

B.

The question is: were police entitled to require Kerns to identify himself during the traffic stop for minor vehicle violations, and then continue to detain him and the driver — after the police were done investigating the motor vehicle violations that precipitated the stop — while they tried to confirm that Kerns was who he said he was. To answer that question, we must review fundamental principles governing the permissible scope of traffic stops.

"'[T]he ultimate touchstone of the Fourth Amendment is reasonableness.'" State v. Terry, 232 N.J. 218, 231 (2018) (internal quotation marks omitted) (quoting Riley v. California, 573 U.S. 373, 381-82 (2014)). Based on observed motor vehicle violations, the police may stop a vehicle, detaining the passenger as well as the driver. Sloane, 193 N.J. at 432. But, in assessing the reasonableness of a police intrusion, a court must consider not only "whether the officer's action was justified at its inception," but also "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Terry v. Ohio, 392 U.S. 1, 20 (1968). Put another way, a

9

court must determine whether a stop, valid in its inception, "was sufficiently limited in scope and duration to remain within the bounds authorized . . . ." State v. Dickey, 152 N.J. 468, 471-72 (1998).

The New Jersey Supreme Court has approved a variety of police intrusions or actions that fall within the scope of a traffic stop, and therefore require no additional justification beyond the justification for the stop itself. Police may check the driver's license, determine whether there are warrants for the driver's arrest, and inspect the registration and proof of insurance. State v. Dunbar, 229 N.J. 521, 533 (2017) (citing Rodriguez v. United States, 575 U.S. 348, 355 (2015)). These are "'ordinary inquiries incident to [the traffic] stop.'" Rodriguez, 575 U.S. at 355 (quoting Illinois v. Caballes, 543 U.S. 405, 408 (2005)); Dunbar, 229 N.J. at 533. "These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." Rodriguez, 575 U.S. at 350.

Within the scope of a traffic stop, police may also ask for identification from a passenger who proposes to drive a vehicle after the driver's arrest, to assure he is a licensed driver. Sloane, 193 N.J. at 432. Police may also check the National Crime Information Center database for records pertaining to that passenger, "when there is a basis for police to focus on the passenger," the

inquiry does not "unreasonably prolong the stop," and accessing the NCIC database was within the scope of the traffic stop. Id. at 426, 438-39.[6]

Actions to assure an officer's safety during the traffic stop may also fall within the scope of the original traffic-related stop. "Traffic stops are 'especially fraught with danger to police officers.'" Rodriguez, 575 U.S. at 356 (quoting Arizona v. Johnson, 555 U.S. 323, 330 (2009)). Thus, an officer may require a driver to alight a vehicle without any additional showing of suspicion of wrongdoing, or threat to the officer's safety. Pennsylvania v. Mimms, 434 U.S. 106, 110-11 (1977); see also State v. Smith, 134 N.J. 599, 618 (1994). As a matter of federal constitutional law, that rule also applies to passengers. Maryland v. Wilson, 519 U.S. 408, 415 (1997).

However, ordering a passenger to exit a vehicle must meet an additional test under our State Constitution. Smith, 134 N.J. at 618. Although the safety interest "remains the same whether the driver or the passenger is involved," requiring a passenger to exit the vehicle imposes a "greater intrusion on the

---

[6] As we discuss below, the United States Supreme Court made clear in Rodriguez that the Fourth Amendment does not tolerate even a de minimis prolongation of a stop for police to engage in activity that neither falls within the traffic-related mission of the stop nor protects the safety of officers while they pursue that mission, and is not independently supported by reasonable and articulable suspicion of wrongdoing. 575 U.S. at 350, 354-57.

A-4731-17T1

passenger's liberty." Id. at 615.  That is because the passenger apparently has done nothing wrong, just happens to be associated with the errant driver, and may have a "legitimate expectation that no further inconvenience will be occasioned by any intrusions beyond the delay caused by the lawful stop."  Ibid. To require a passenger to exit, "an officer must be able to point to specific and articulable facts that would warrant heightened caution to justify ordering the occupants to step out of a vehicle detained for a traffic violation."  Id. at 618.

Police inquiries or intrusions that go beyond the officer's "traffic mission" or the officer's safety while pursuing that mission — that are instead focused on general crime detection — must meet a different standard.  They must not prolong the time it takes to effectuate the stop's mission, or they must be independently supported by reasonable and articulable suspicion of wrongdoing.

If pursuit of traffic or safety-related inquiries or intrusions give rise to suspicions of wrongdoing unrelated to the traffic offense, "an officer may broaden [the] inquiry and satisfy those suspicions."  Dickey, 152 N.J. at 479-80 (alteration in original) (quoting United States v. Johnson, 58 F.3d 356, 357-58 (8th Cir. 1995)).  The additional inquiries are grounded not in the probable cause of the initial traffic violation; rather, they are grounded in the new suspicions

aroused by, or while conducting, the lawful traffic-related or safety-related inquiries. Id. at 480.

Absent such new suspicions, police intrusions unrelated to the traffic-mission are temporally circumscribed. "[T]he Fourth Amendment tolerate[s] certain unrelated investigations that d[o] not lengthen the roadside detention." Rodriguez, 575 U.S. at 354. "A seizure justified only by a police-observed traffic violation . . . 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." Id. at 350 (quoting Caballes, 543 U.S. at 407). "An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." Id. at 355.

For example, a dog sniff "is a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing'" and "is not an ordinary incident of a traffic stop." Id. at 355-56 (alteration in original) (quoting Indianapolis v. Edmond, 531 U.S. 32, 40-41 (2000)). Police may not proceed along such an investigatory avenue if "conducting the sniff prolongs — i.e. adds time to — the stop." Id. at 357 (internal quotation marks omitted).

13

A stop is prolonged if it is extended "'beyond the time reasonably required to complete th[e] [traffic] mission.'" Id. at 354-55 (first alteration in original) (quoting Caballes, 543 U.S. at 407). The chronology or sequence of police actions is not determinative. Police may not justify non-traffic-related inquiries by waiting to write a traffic ticket last. "The critical question . . . is not whether the dog sniff [or other general crime-detection inquiry] occurs before or after the officer issues a ticket." Id. at 357. The issue is whether the stop is prolonged. Ibid. In contrast to safety-related intrusions, there is no de minimis exception for an "endeavor to detect crime in general or drug trafficking in particular." Id. at 356-57; see also United States v. Clark, 902 F.3d 404, 410 (3d Cir. 2018).

Although Rodriguez involved a traffic stop that may have been prolonged by a dog sniff, the Court relied in part on its decision in Johnson. Rodriguez, 575 U.S. at 354-55 (citing Johnson, 555 U.S. at 327-28). In Johnson, police questioned a passenger about "matters unrelated to the justification for the traffic stop." Johnson, 555 U.S. at 333. The Court held that "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." Ibid.

14

Courts have since applied <u>Rodriguez</u> to stops prolonged by off-mission questioning of a passenger's identity, like that at issue here. In <u>United States v. Landeros</u>, 913 F.3d 862 (9th Cir. 2019), and in <u>Clark</u>, 902 F.3d at 406, the courts of appeal held that police unlawfully prolonged a traffic stop to inquire about a passenger's identity.

In <u>Landeros</u>, a police officer with authority to enforce Arizona and tribal law pulled over a speeding car. 913 F.3d at 864. Upon request, the driver provided identification. <u>Ibid.</u> The officer then asked for identification from two women in the back seat. <u>Ibid.</u> The officer had a reasonable suspicion they were violating a non-traffic law, because they appeared to be minors, and they were out past a tribal curfew. <u>Id.</u> at 864, 867.

However, no reasonable and articulable suspicion of a non-traffic offense supported the officer's command that Landeros, the front-seat passenger, produce his identification. <u>Id.</u> at 868. Landeros refused repeated commands to identify himself, and then refused repeated commands that he exit the car for being non-compliant. <u>Ibid.</u> Several minutes passed before Landeros finally exited the car, revealing two open beer bottles, pocket knives, and a machete on the floor. <u>Ibid.</u> Police arrested him for failing to provide his true name and refusing to comply with the police officers' direction. <u>Ibid.</u> Police also charged

15

him with possessing an open container. Incident to arrest, police seized another knife and some bullets from his pockets. Ibid. Landeros was indicted for possession of ammunition by a convicted felon. Ibid.

The court reversed the trial court's order denying Landeros's suppression motion. Two holdings of the court pertain to the case before us. First, the court held that demanding the passenger's identification fell outside the traffic-related mission that gave rise to the stop and was unrelated to protecting officer safety. Id. at 868. Regarding enforcement of motor vehicle laws, the court said, "A demand for a passenger's identification is not part of the mission of a traffic stop. . . . The identity of a passenger . . . will ordinarily have no relation to a driver's safe operation of a vehicle." Ibid. Regarding officer safety, the court stated, "[K]nowing Landeros's name would not have made the officers any safer." Ibid. Rather, the inquiries extended the stop, and prolonged the officers' exposure to him, which "was, if anything, 'inversely related to officer safety.'" Ibid. (quoting United States v. Evans, 786 F.3d 779, 787 (9th Cir. 2015)).

Second, because the identification demands fell outside the scope of the traffic stop, the court held that they could not prolong the stop absent independent reasonable suspicion. Ibid. The court found that the inquiries prolonged the stop beyond what was reasonably necessary to fulfill the traffic-

16

related mission.  Ibid.  And, the court rejected the government's argument "that Landeros's refusal to identify himself 'provided reasonable suspicion of the additional offenses of failure to provide identification and failure to comply with law enforcement orders,'" in violation of Arizona law.  Ibid.  Recognizing the circular nature of the government's contention, the court held that Landeros could not have violated the Arizona law because "the officers lacked reasonable suspicion[] at the time they initially insisted he identify himself, that Landeros had committed, was committing, or was about to commit any crimes . . . ."  Id. at 869.

In Clark, police stopped a van for driving without headlights and other motor vehicle violations.  902 F.3d at 406.  The driver produced a license and proof of insurance, but could not locate the registration of the vehicle, which he said belonged to his mother.  Ibid.  A computerized check confirmed the license was valid, and the car was registered to a woman with the driver's surname, at the driver's address.  Ibid.  The driver offered to call his mother, but the officer ignored the offer.  Ibid.  Instead, after ascertaining the driver had a criminal record for drug offenses, but no outstanding warrants, police returned to the vehicle and inquired about the driver's criminal record.  Id. at 406-07.  Police asked him to exit the car, and continued questioning him.  Id. at 407.

The officer then asked the driver about the passenger, the defendant Clark, for his name, how he knew him, and how they came to travel together. Ibid. The officer then posed the same questions to Clark, and his answers conflicted with the driver's. Id. at 407-08. Police then claimed they detected the smell of marijuana on Clark's side of the car. After asking Clark to alight from the car, a subsequent search of him uncovered a gun and a marijuana cigarette. Id. at 408. The driver was permitted to leave once issued a summons for his motor vehicle violations, and Clark was arrested and later indicted for possession of a weapon by a convicted felon. Ibid.

The district court suppressed the gun and the Third Circuit affirmed, after concluding that the police's inquiries of the driver and Clark prolonged the stop beyond its traffic-related mission. Ibid. The court held that the officer could not reasonably question the driver's authority after "he confirmed through the computerized check that [the driver] was authorized to drive the vehicle, and when there was no fact calling that authority into doubt." Id. at 411. The court noted that the officer's inquiries were not really intended to acquire criminal history information, which the officer already had obtained. Id. at 411 n.6. The officer's "inquiry into [the driver's] criminal history was thus not tied to the traffic stop's mission, and, at the point, 'tasks tied to the traffic infraction . . .

18

reasonably should have been . . . completed.'"  Id. at 411 (alteration in original) (quoting Rodriguez, 575 U.S. at 354).

C.

Turning to the case before us, we conclude, as did the courts in Landeros and Clark, that the police inquiries of Kerns prolonged the stop; were unrelated to the traffic-related mission of the initial stop; and were not independently supported by reasonable and articulable suspicion of other wrongdoing.

It is evident from the video recording that, by questioning Kerns, the troopers prolonged the stop beyond the time reasonably required to complete the traffic-related mission.  As noted, the point is not what came first — the traffic-related investigation of the driver, or the non-traffic related inquiries of Kerns, the passenger.  The point is that the inquiries of Kerns extended the stop beyond the time it would have ended, had the troopers limited themselves to the traffic-related mission, as the Fourth Amendment required them to do.

As in Landeros, we discern no evidence that questioning Kerns furthered the investigation of the suspected traffic violations.  Police stopped Kerns's driver for speeding and operating a vehicle with a non-functioning headlight. After the stop, they discovered the driver could not locate the registration. However, the troopers did not question Kerns about the driver's ownership, or

19

authority to drive the vehicle. And the trooper assured the driver that his authority to possess the vehicle could be confirmed by running a computer check. Simply put, the troopers' persistent inquiries of Kerns did not fall within the scope of the traffic-related mission; rather, they were "aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'" Rodriguez, 575 U.S. at 355 (alteration in original) (quoting Edmond, 531 U.S. at 40-41).

However, the police lacked reasonable and articulable suspicion of any such wrongdoing. The State contends Kerns acted nervously, fidgeted with his cell phone, and avoided eye contact before the trooper asked Kerns if he had identification. Considering those behaviors, the risks to officers who make traffic stops, and the degree of police intrusion, the State argues it was reasonable for the trooper to ask Kerns for his identification, and then his name and date of birth.

We are unconvinced. We assume for argument's sake that Kerns acted nervously, although the trial court made no such finding, and we are in no position to make that finding ourselves.[7] Nonetheless, "nervousness is not sufficient grounds for the reasonable and articulable suspicion necessary to

_____

[7] The trial court noted in its written opinion that defendant denied that he "engaged in any conduct that would justify questioning, a request for identification or investigation of any kind."

extend the scope of a detention beyond the reason for the original stop." State v. Carty, 170 N.J. 632, 648 (2002).[8]

The State adds to the mix the "late hour" and the driver's failure to produce the registration. But, neither fact converts Kerns's presumed nervousness into reasonable and articulable suspicion of wrongdoing. Although it was a few minutes past midnight, the stop occurred after the car had just left an interstate bridge, where travelers are common, not a quiet residential neighborhood, where they are not. Compare Vasquez v. Lewis, 834 F.3d 1132, 1138 (10th Cir. 2016) (no reasonable suspicion when defendant was traveling late at night, on a major interstate, and appeared nervous to the officers), with State v. Martinez, 260 N.J. Super. 75, 78 (App. Div. 1992) (stating, "[w]e take notice . . . that operation of a motor vehicle in the middle of the night on a residential street at a snail's pace between five and ten m.p.h. is indeed 'abnormal'").

Also, under the circumstances, the driver's failure to produce registration was no reason to suspect his passenger of criminal activity. Notably, the trooper assured the driver, who had produced his driver's license and proof of insurance and was searching for the registration, that the trooper could easily confirm his

---

[8] Carty was modified, solely on the issue of its retroactivity, in State v. Carty, 174 N.J. 351 (2002).

ownership by running his tag number through his computer system. Evidently, the driver's failure to produce a registration was not a major concern, since the trooper ultimately decided not to give the driver a ticket for that infraction, or for his speeding or blown headlight, both of which provided troopers the grounds to stop the car in the first place. See Hornberger v. Am. Broad. Co., 351 N.J. Super. 577, 609 (App. Div. 2002) (stating that police's failure to issue a summons for erratic driving, or near collision, or even mention it to the driver "undermine[d] the importance of th[e] allegation"); cf. State v. Chisum, 236 N.J. 530, 548-49 (2019) (stating that once police decided not to issue a summons for a noise violation at a motel, their "decision to continue their investigation to ascertain the identities of every occupant of the [motel] room was misplaced").

In sum, the troopers' persistent efforts to ascertain Kerns's identity violated Kerns's right to be free from an unreasonable search or seizure, because it prolonged the stop without furthering its traffic-related mission, and was not independently supported by reasonable and articulable suspicion of wrongdoing.

### D.

The State argues that even if the troopers' inquiries violated Kerns's rights, the drug seizure at the police station was so attenuated from the constitutional violation that the drugs should not be suppressed. "'[T]he exclusionary rule will

not apply when the connection between the unconstitutional police action and the evidence becomes so attenuated as to dissipate the taint from the unlawful conduct.'" State v. Williams, 192 N.J. 1, 15 (2007) (quoting State v. Badessa, 185 N.J. 303, 311 (2005)). To determine whether the taint of unlawful conduct has dissipated, a court must consider "three factors: (1) the temporal proximity between the illegal conduct and the challenged evidence; (2) the presence of intervening circumstances; and (3) the flagrancy and purpose of the police misconduct." State v. Johnson, 118 N.J. 639, 653 (1990). The court does not apply a "but for" test. Ibid.

We decline to reach the State's attenuation argument because the State did not raise the issue before the trial court. We are not obliged to reach an issue that the State did not present to the trial court in the first instance, when it does not affect a significant public interest or the court's jurisdiction. See Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973). Furthermore, assessing attenuation is usually a "factual matter," Johnson, 118 N.J. at 653, which the trial court was best-suited to address in the first instance, see State v. Robinson, 200 N.J. 1, 20-21 (2009) (stating an "appellate court should stay its hand and forego grappling with an untimely raised issue" that was not fully explored by the trial court). In particular, the record does not disclose, and the trial court did not find, how

much time passed after the troopers questioned Kerns and before they discovered the CDS ("temporal proximity" factor); or what was the non-traffic-related purpose of questioning Kerns ("flagrancy and purpose" factor).

We have declined to consider a new theory by the State to avoid applying the exclusionary rule to an unconstitutional search or seizure, where the State failed to develop the record when it had the chance to do so. See State v. Mahoney, 226 N.J. Super. 617, 626 (App. Div. 1988) (declining to consider State's inevitable discovery and search-incident-to-arrest arguments raised for the first time on appeal); see also State v. Bradley, 291 N.J. Super. 501, 516-17 (App. Div. 1996) (declining to address inevitable discovery argument raised for the first time on appeal).

The burden to establish an exception to the warrant requirement rests with the State. Elders, 192 N.J. at 246. The State did not attempt to meet its burden to establish attenuation before the trial court. Therefore, we decline the State's invitation that, on appeal, we affirm the order denying suppression on attenuation grounds.

E.

In sum, the trial court should have granted defendant's motion to suppress the drugs that police seized from him, incident to his arrest for hindering after police asked him to identify himself.

## II.

Turning to the second incident, the court correctly denied Kerns's motion to suppress the drugs police seized incident to arrest after he returned from Newark. Based on Kerns's participation in the two controlled buys, police had probable cause to arrest him. We so conclude, even assuming, for argument's sake, that police lacked probable cause to believe Kerns committed an offense during his round trip to Newark. A successful controlled buy is "persuasive evidence" to establish probable cause. State v. Keyes, 184 N.J. 541, 556 (2005), and it is in this case. The trial court credited the police sergeant who testified he directly observed the transactions. We also reject Kerns's argument that any probable cause from the controlled buys was too stale to justify Kerns's arrest two days later. The police investigation was still ongoing. They did not unreasonably delay effectuating their arrest. Kerns's challenge to the court's second order lacks sufficient merit to warrant further discussion. R. 2:11-3(e)(2).

A-4731-17T1

Reversed as to the order in Indictment No. 17-01-0050; affirmed as to the order in Indictment No. 17-01-0051; and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-4731-17T1

_____

**OSTRER, J.A.D., concurring.**

Although we conclude the trial court should have suppressed the drugs in Indictment No. 17-01-0050 because police unlawfully prolonged the traffic stop, I write to express my concern about the effect on personal privacy when police demand passengers' identification for reasons untethered to the purpose of the motor vehicle stop, even when the stop is not prolonged.

Our Constitution imposes not only temporal limitations on a stop. Under our Constitution, "police officers are required to use the least intrusive means necessary in effectuating the purpose of an investigative detention." Chisum, 236 N.J. at 550. Our Court has consistently endorsed the "least intrusive means" limitation. See State v. Shaw, 237 N.J. 588, 613 (2019) (stating "[o]ur Constitution requires officers to pursue the least intrusive means when they conduct an extended investigatory detention"); State v. Coles, 218 N.J. 322, 344 (2014) (stating an "officer must use the least intrusive means necessary to effectuate the purpose of the investigative detention"); State v. Davis, 104 N.J. 490, 502 (1986) (stating that "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time"). One may ask whether demanding that each passenger state one's name and date of birth, and supply documents or otherwise

prove that what they say is true, is the least intrusive means necessary for the officer to complete the traffic-related investigation of the driver, which is the purpose of the stop.

I acknowledge that the United States Supreme Court adopted the "least intrusive means" standard, see Florida v. Royer, 460 U.S. 491, 500 (1983), but, "in Illinois v. Caballes[, 543 U.S. 405 (2005)] . . . severely weakened the 'scope'/'intrusiveness' limitation by holding that an investigative technique does not violate that limitation unless the particular tactic employed 'itself infringed [the detainee's] constitutionally protected interest in privacy,' i.e. was itself a search," 4 Wayne R. LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 9.2(f) (6th ed. 2020) (alteration in original). The United States Supreme Court has "concluded that the Fourth Amendment tolerate[s] certain unrelated investigations that d[o] not lengthen the roadside detention," including questioning and dog sniffs. Rodriguez, 575 U.S. at 354. And, our Supreme Court followed suit with respect to dog sniffs. Dunbar, 229 N.J. at 539.

Nonetheless, our State Constitution protects persons from warrantless searches and seizures more broadly than the Fourth Amendment. State v. Shaw, 237 N.J. 588, 616 (2019). In particular, our Constitution requires a greater showing than does the Fourth Amendment to justify an officer ordering a

passenger to exit a stopped vehicle, Smith, 134 N.J. at 617, or to justify an officer opening a passenger-side door of a stopped vehicle, State v. Mai, 202 N.J. 12, 23 n.4 (2010). Our Constitution sets a higher bar than the Fourth Amendment for conducting consent searches of motor vehicles. Carty, 170 N.J. at 638-39. Police must have "a reasonable and articulable basis beyond the initial valid motor vehicle stop" in order to effectuate a consent search. Id. at 647.

Our Constitution protects more than an individual's interest in being free from unnecessarily prolonged traffic stops. It also protects "the individual's right to be protected from unwarranted and/or overbearing police intrusions." Davis, 104 N.J. at 504; see also State v. Privott, 203 N.J. 16, 25-26 (2010) (quoting Davis, 104 N.J. at 504). A police officer may not be "overbearing or harassing in nature." Davis, 104 N.J. at 503 (quoting State v. Sheffield, 62 N.J. 441, 447 (1973)). Also, "'the degree of fear and humiliation that the police conduct engenders'" is a factor that may convert an investigative stop into an arrest. Dickey, 152 N.J. at 479 (quoting United States v. Lego, 855 F.2d 542, 544-45 (8th Cir. 1988)). In determining the reasonableness of police activity, a court must balance the public's interest in being free from overbearing

activity against the State's law enforcement interests, in light of the "totality of circumstances." <u>Davis</u>, 104 N.J. at 504.

The Court observed that requiring reasonable and articulable suspicion of wrongdoing to request consent to search "serve[d] the prophylactic purpose of preventing the police from turning a routine traffic stop into a fishing expedition for criminal activity unrelated to the stop." <u>Carty</u>, 170 N.J. at 647. Yet, that is what police may do, if they routinely conduct passenger identity checks. Once unmoored from the reasonable and articulable suspicion that justified the stop in the first place, or from a new reasonable and articulable suspicion that may arise while fulfilling the traffic-related mission, the identity check may become a form of "bait," and the decision to go "fishing" may become a purely discretionary call, absent separate suspicion of wrongdoing. However, as our Court has recognized, unbridled discretion threatens the values that underlie the right to be free from unreasonable searches and seizures. <u>Id.</u> at 641.

We need not find that a passenger identity check is a "search" in order to take it seriously. <u>See</u> LaFave, 4 <u>Search & Seizure</u> § 9.3(d) (criticizing the "no-search-ergo-no-scope-violation oversimplification" of United States Supreme Court jurisprudence). Our Constitution protects a person's privacy, as well as a person's liberty. Requiring a passenger to stand outside a vehicle is not a search;

but it is an "intrusion on the passenger's privacy" deserving of protection.  Smith, 134 N.J. at 615.  Commanding  passengers to say who they are and when they were born, and to produce proof that they are telling the truth, can be humiliating and overbearing, especially if the passengers perceive that they have been arbitrarily singled out for this form of unrelated investigation.  It would make no difference to the passenger that one's identity is a matter of public record.  The passenger about whom there is no reasonable and articulable suspicion of wrongdoing, yet is seized roadside, has a right to be left alone.

In a free society, citizens are not subject to arbitrary commands to "show their papers," or prove their identity.  That was the fate of African-Americans who had to show their "free papers" during slavery,[1] and the fate of Jews who had to show identification papers in the Warsaw Ghetto.[2]  In Hornberger, we quoted with approval the Massachusetts appellate court's observation that "'a

---

[1]  See Frederick Douglass, Life and Times of Frederick Douglass (1892) 245-49 (describing the "custom in the State of Maryland" to require African-Americans "to have what were called free papers," the alternative use of sailor's papers to establish one's free status, and an incident in which free persons were required to display their identification), republished on line and available at https://docsouth.unc.edu/neh/dougl92/dougl92.html.

[2]  See United States Holocaust Memorial Museum, Checking Papers in the Warsaw Ghetto, https://encyclopedia.ushmm.org/content/en/photo/checking-papers-in-the-warsaw-ghetto (last visited December 16, 2020).

random request for identification papers constitutes . . . the sort of request uncomfortably associated with authoritarian societies and most commonly made of persons belonging to a racial or ethnic minority.'" 351 N.J. Super. at 613 (quoting Com. v. Alvarez, 692 N.E.2d 106, 109 (Mass. App. Ct. 1998)). Although the question arose in a police officers' lawsuit alleging that a broadcast mischaracterized their actions, we held in Hornberger that officers may not routinely demand identification from passengers during a traffic stop for a motor vehicle violation. 351 N.J. Super. at 611-14. Unlike in Sirianni, we held that the passengers were not free to refuse the police officers' identification request, and the request lacked reasonable suspicion that the passengers had engaged in wrongdoing. Id. at 612-13.[3]

---

[3] In State v. Chapman, 332 N.J. Super. 452, 462 (App. Div. 2000), we considered "what inquiries may a police officer lawfully propound to an individual who has been stopped for a traffic infraction." We stated, "A police officer may not engage in 'excessive questioning about matters wholly unrelated to the purpose of a routine traffic stop.'" Id. at 463 (quoting United States v. Kelley, 981 F.2d 1464, 1470 (5th Cir. 1993)). However, because the trooper's questions about the occupants' itinerary were reasonably related to the erratic driving that prompted the stop, we had no need to define precisely what constituted "excessive." Ibid. In Hornberger, we effectively answered the question as it relates to identity checks, holding that they were unlawful under the circumstances presented there. 351 N.J. Super. at 613. Hornberger narrowed the scope of questioning that would be permitted under the unnecessarily broad statement in State v. Hickman, 335 N.J. Super. 623, 636 (App. Div. 2000), that during a valid motor vehicle stop, "police may question the occupants, even on

The only reason the officer is physically able — as distinct from constitutionally permitted — to inquire of a passengers' identity is that the officer has seized the vehicle and everyone in it upon a reasonable and articulable suspicion of a motor vehicle violation. Some states, eschewing the federal approach, have adhered more closely to the principle that police activity during the stop must be "reasonably related in scope to the circumstances which justified the interference in the first place," Terry, 392 U.S. at 20, even if the activity involves questioning rather than an actual search. See LaFave, 4 Search & Seizure, § 9.3(d) and n. 288 (approvingly citing cases).

Courts of other states have concluded that asking passengers for identification without reasonable or articulable grounds is an unconstitutional intrusion. For example, a passenger's "mere presence" during a traffic stop for a faulty license plate light did not "tip the balance" in favor of demanding identification in State v. Affsprung, 87 P.3d 1088, 1095 (N.M. Ct. App. 2004). "To permit law enforcement officers to ask for and to check out passenger identification under these circumstances opens a door to the type of

---

a subject unrelated to the purpose of the stop, without violating the Fourth Amendment, so long as such questioning does not extend the duration of the stop." In that case, it was within the traffic-related mission for police to ask the defendant-passenger if he had a driver's license or permission to use the car, as the driver lacked a valid license and registration. Id. at 635, 637.

indiscriminate, oppressive, fearsome authoritarian practices and tactics of those in power that the Fourth Amendment was designed to prohibit." Ibid. See also Alvarez, 692 N.E.2d at 109 (reaffirming prior caselaw that police must have a reasonable and articulable suspicion before demanding identification from passengers); State v. Rankin, 92 P.3d 202, 203 (Wash. 2004) (holding that the state's constitution "affords automobile passengers a right of privacy that is violated when an officer requests identification from a passenger for investigative purposes, absent an independent basis for making the request"); Campbell v. State, 97 P.3d 781, 785 (Wyo. 2004) (holding that "[d]uring the stop, an officer generally may not ask the detained motorist questions unrelated to the purpose of the stop, including questions about controlled substances, unless the officer has reasonable suspicion of other illegal activity");[4] cf. State v. Robbins, 171 A.3d 1245, 1249-50 (N.H. 2017) (stating test, under state constitution, that police questioning may not "change[] the fundamental nature of the stop," even if the questioning does not prolong the stop, when the question is not "reasonably related to the initial justification for the stop" and the officer lacked other "reasonable, articulable suspicion that would justify the question").

---

[4]  But see Marquez-Guitierrez v. State, 167 P.3d 1232, 1236 (Wyo. 2007) (stating that an officer may engage a passenger in "idle chit chat").

A-4731-17T1

Because we hold that the troopers unlawfully prolonged the traffic stop, we need not decide that requiring Kerns to identify himself violated his State constitutional rights. Yet, I express my concern about a rule that would allow police to routinely demand that passengers say who they are, and prove that what they say is so, for reasons unsupported by reasonable and articulable suspicion of wrongdoing and for reasons unrelated to officer safety, so long as the inquiry does not prolong the stop. Such a rule would threaten individual privacy, open the door to "fishing expeditions," and increase the risk of arbitrary exercises of police discretion.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4731-17T1